**The below described is SIGNED.**

**Dated: August 18, 2009** _____



**WILLIAM T. THURMAN**
**U.S. Bankruptcy Chief Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF UTAH**
**CENTRAL DIVISION**

---

| | |
|---|---|
| **In re:** | |
| **STEVE ZIMMER PAIGE,** | **Bankruptcy No. 05-34474** |
| Debtor. | **Chapter 11** |
| **GARY E. JUBBER,** Liquidating Trustee, and **CONSUMERINFO.COM, INC.,** | |
| Plaintiffs, | **Adversary Proceeding 06-02299** |
| v. | |
| **SEARCH MARKET DIRECT, INC.; STEPHEN S. MAY; CHAD SAYERS; PSNET COMMUNICATIONS; RANDY CONKLIN; MARK TIMOTHY; PROMARKETING NETWORK, INC.;** and **DOES I THROUGH X,** | |
| Defendants. | |

---

**MEMORANDUM DECISION**

---

In this highly contested adversary proceeding (the "Adversary Proceeding"), which

involved 19 days of evidence and argument, the Plaintiffs sought to recover, among other things,

a very valuable domain name <freecreditscore.com> (the "Domain Name")[1] from the Defendants

---

[1] A domain name is a name that identifies one or more Internet Protocol (IP) addresses. Domain names are used in the Uniform Resource Locators (URLs) to identify particular web pages. Because the Internet is based on IP addresses, not domain names, every web server

pursuant to various Bankruptcy Code and state law provisions. Although the Plaintiffs have

asserted claims against multiple defendants (the "Defendants"), this is primarily a two-party

dispute between Gary Jubber, the Liquidating Trustee (the "Trustee" or "Jubber") and

ConsumerInfo.com, Inc. ("ConsumerInfo") (collectively the "Plaintiffs") on the one hand, and

Stephen May ("May") and Search Market Direct, Inc. ("SMDI") (collectively the "SMDI

Defendants") on the other. This Adversary Proceeding involves a number of complicated factual

and legal issues, and the Court commends the parties and their counsel for their excellent

presentation of these issues.

A central issue before the Court is whether the Domain Name, which is estimated to be

worth between $350,000 and $200 million, was owned by Steve Paige ("Paige" or "Debtor")

individually at the time of the relevant pre-petition and post-petition transfers, or by his affiliate

Consumer Credit Services, LLC ("CCS, LLC"). Indeed, the Plaintiffs' claims for avoidance,

conversion, turnover, and declaratory relief depend on the resolution of this issue. Before the

Court addresses this issue, however, it must determine whether the Plaintiffs have standing to

prosecute this Adversary Proceeding, and if so, the standard of proof that applies to the causes of

action asserted in the amended complaint (the "Amended Complaint").

---

requires a Domain Name System (DNS) server to translate domain names into IP addresses.
When activated, a domain name directs the viewer to a web page owned and/or controlled by a
provider of goods and services which may be viewed. In many cases, the viewer may make
purchases by use of a credit card number. Some domain names are extraordinarily valuable
while others are less valuable. Domain names may be valued according to how much traffic or
how many "hits" they bring to the web page. Ones with catchy names that tie into the goods or
services to be sold are generally the most valuable. In this case, the Domain Name appears to be
a highly lucrative and sought-after asset.

Having carefully reviewed and considered the parties' oral and written arguments, the

evidence and testimony presented at trial, and having conducted its own independent research of

the relevant case law, the Court issues the following Memorandum Decision.[2]

## I.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a

core proceeding under 28 U.S.C. § 157(a)(2)(A), (E), and (O).  Venue is properly laid in this

Court under 28 U.S.C. § 1409.  Standing, which is a component of jurisdiction, is addressed

herein.

## II.    BACKGROUND AND FINDINGS OF FACT

In order to put the Court's ruling in perspective, the Court believes that it is necessary to

discuss the history and the facts of this matter in some degree of detail. Particularly, the changes

in the Domain Name's registration and the dates of the attempted transfers are central to this

matter and should be described fully.

Throughout the trial, the parties referred to a number of acronyms and other

abbreviations to designate an entity.  Some were extraordinarily confusing, such as CCB, CCB

Data Corp., CCS and CCS Financial, Inc., and CCS Financial, LLC.  Others referred to

commonly used phrases denoting current abbreviated terms associated with domain name

registration databases, such as the "WHOIS."  The facts of this case also lend themselves almost

to mystery novel status, complete with an unidentified "snitch" using the name THIRSTY 4

---

[2]    This Memorandum Decision constitutes the Court's findings of fact and
conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this proceeding
by Federal Rules of Bankruptcy Procedure 9014 and 7052, and incorporates by reference all of
the Court's oral rulings made on the record during trial.  Any of the findings of fact herein are
also deemed to be conclusions of law and conclusions of law herein are also deemed to be
findings of fact and shall be equally binding as both.

JUSTICE, and a domain name marketing professional from Las Vegas operating under an alias

to avoid detection of his real name.  In its findings, the Court has focused only on salient facts

and has attempted to clarify some of this confusion.  With this overlay, the Court's observation

of the parties' conduct and dealings with each other should be better understood.

      A.    The Pre-Petition Registration History and Use of the Domain Name

      The Debtor acquired the Domain Name in May 2000 and registered it in his own personal

name with Network Solutions, Inc.[3] ("Network Solutions") on May 3, 2000.[4]  In addition to

being listed as the registrant of the Domain Name by Network Solutions, Paige was also listed as

the technical, administrative, and billing contact for the Domain Name.[5]  As part of the Domain

---

[3]      Network Solutions is a domain name registrar.  A registrar is a company that holds registrations for domain names. Transcript of Trial from 4/16/09 at 184:24-185:1 (hereinafter "Tr.").  The registration and ownership information for a particular domain name is stored on Network Solutions' WHOIS database.  The WHOIS is a publically available database containing the name and contact information of a domain name's registrant, primary or administrative contact, and technical contact.  A registrant is the person or organization that holds the registration for a particular domain name.  *Id*. at 185:22-24.  As part of the domain name registration process, Network Solutions will assign a "Person-Org ID" to the registrant, who can then change that to a username and create a password.  *Id*. at 188:9-20.  The username and password are unique to each user and are used to access the domain name account and make changes to the domain name registration or the account.  The registrant can also designate an administrative contact on the domain name account to act on the registrant's behalf.  *Id*. at 187:2-7.  Although the registrant and the administrative contact can be the same person, if the registrant designates someone other than himself to be the administrative contact, then that person would have his own username and password to access the account.  *Id*. at 189:3-15.  Like the registrant, the administrative contact can make changes to the domain name account, including updating his e-mail address, purchasing new products for the account, updating the address information, and performing other functions.  *Id*. at 186:9-18.  Finally, the registrant can also designate a technical contact in his account.  Unlike the registrant and the administrative contact, the technical contact has limited access to the domain name account.  *Id*. at 189:22-190:1.  The technical contact is only authorized to make changes to the server information, i.e., to update the DNS.  *Id*. at 190:4-10.

[4]      Sterling Depo. at 10:14-11:18, 4/2/08.

[5]      *See* Pretrial Order, Ex. A; *see also* Ex. 210.

Name's initial registration, Paige paid $70 to Network Solutions with his personal credit card to cover the Domain Name registration fee for May 3, 2000 through May 3, 2002.

On August 19, 2002, Paige formed CCS, LLC, which was engaged in the business of providing services to consumers to improve their personal credit scores.  The Articles of Organization for CCS, LLC show that Paige and Liahona Trust were its only members.[6]  Prior to CCS, LLC's formation, Paige owned a company called CCS Financial, Inc. ("CCS Financial"), which also provided credit repair services to consumers.  Although the SMDI Defendants claim that CCS Financial's operations and assets, including its name, were commingled and consolidated into CCS, LLC, there are no documents that evidence this merger, and Paige's bankruptcy statements and schedules show them as separate entities on September 16, 2005 (hereinafter the "Petition Date").[7]

On May 2, 2003, Paige paid $75 to renew the Domain Name registration with Network Solutions for another three years.  As with the initial registration fee, Paige paid the renewal fee with his personal credit card.  Although CCS, LLC reimbursed Paige for the registration fee, the evidence shows that CCS, LLC paid the entire credit card bill that contained not only the registration fee but other personal and business expenses.

In or around September 2004, Paige entered into a joint venture with Citizens Credit Bureau, Inc. ("CCB"), which used the Domain Name to direct internet traffic to a web page entitled "FreeCreditScore.com" in order to generate client leads for CCB and/or the CCS

---

[6]      Ex. 11.

[7]      For purposes of this Memorandum Decision, where it is unclear as to which of the two entities is involved in a particular transaction or agreement, the Court will refer to them collectively as "CCS entities" or "CCS."

entities.  The Domain Name was used by the joint venture until approximately mid-January

2005.  Throughout this period, Paige was the registered owner and the administrative and billing

contact for the Domain Name, but the technical contact had changed from Paige to Thomas

Gazelle ("Gazelle") of Real Tours, Inc. ("Real Tours") in December 2003.[8]

Sometime in January 2005, Paige began working on a different joint venture with Colt

Investment Group, LLC ("Colt").  On January 13, 2005, a Term Sheet was executed between

"Consumer Credit Services, LLC, AKA, CCS Financial" as "Seller" and Colt as "Buyer" (the

"Term Sheet").[9]  The Term Sheet was signed by Tali Haleua ("Haleua") on behalf of the Buyer

"Colt Technologies, LLC," and by Allene Paige ("Allene"), Steve Paige and Lee Price ("Price")

on behalf of the Seller.[10]  Upon the execution of the Term Sheet, the assets of the Seller were to

be conveyed and transferred to the Buyer.[11]  The Term Sheet did not specify which assets were

to be transferred or whether they included the Domain Name.

Shortly after the Term Sheet was signed, Paige; CCS, LLC; Price; Allene; and Liahona

Foundation, as Sellers, and Colt, as Buyer, entered into an Agreement of Purchase and Sale of

Assets ("Colt APA").  Under the Colt APA, executed on January 17, 2005, the Sellers agreed to

---

[8]     *See* Pretrial Order, Ex. B.  Gazell and his company, Real Tours, provided website development and web hosting services to Paige and/or CCS.  Gazel remained as the technical contact for the Domain Name until April 1, 2005.

[9]     Ex. 28.

[10]     *Id*.

[11]     *Id*.

sell all of the business assets of CCS, LLC (but not CCS, LLC itself).[12]  The Colt APA was

signed by Paige individually and as "Managing Member of [CCS, LLC];" Allene individually

and as "Manager of Liahona Foundation;" Price individually; Haleua as "Managing Member of

Colt Investment Group, LLC;" and John Smart as "Trustee of Liahona Foundation."[13]  CCS

Financial was not mentioned anywhere in the Colt APA nor was it a signatory to the agreement.

Although the Colt APA made no specific reference to the Domain Name, Haleua had

learned through his investigation that Paige held the Domain Name in his individual name and

also understood that Paige was CCS, LLC and CCS Financial.  As of April 1, 2005, Paige was

the registered owner of the Domain Name and the "WHOIS Billing Contact" in the Network

Solutions records, but the "Primary Administrative Contact," the "WHOIS Administrative

Contact," the "WHOIS Technical Contact," and the "Billing Contact" were changed to Randy

Conklin ("Conklin") of Colt.[14]  Conklin, a defendant in this case, was an employee of Colt and

acted under Haleua's and Paige's direction when he made changes to the Domain Name

registration in the Network Solutions records.

Paige remained the registered owner of the Domain Name (also referred to as the

registrant) until June 14, 2005, when the registrant changed from Paige to Conklin.  Although

Conklin was listed as the registrant through the Petition Date and until November 24, 2005, he

denies ever having ownership rights to the Domain Name.  Initially he believed that he held it for

---

[12]     Ex. 29.

[13]     *Id*.

[14]     Pretrial Order, Ex. B.

Haleua, but after the separation discussed below Conklin testified that he was holding it for

Paige and was to transfer it back to him unless directed otherwise.

By July 2005, the relationship between Paige and Colt's principals became strained, and

the parties decided to separate.  On July 18, 2005, two months before Paige filed for bankruptcy,

Haleua, Paige, Allene, and Price, as "members of CCS Financial, and/or Colt Credit Services,

LLC," entered into a Separation Agreement (the "Colt Separation Agreement") pursuant to

which Haleua and Colt agreed to transfer "all of their interest, equity, and ownership [of CCS

Financial] to CCS Financial, Steve and Allene."[15]   Among the reimbursements that Haleua and

Colt agreed to make to CCS Financial were the "title of all Internet URL's to be transferred and

conveyed *back to CCS*, (freecreditscore.com, getyourscore.com, getyourcredit.com,

improveyourscore.com)."[16]  As more fully discussed later in this Memorandum Decision, the

language of the Colt Separation Agreement and the phrase "back to CCS" has been a source of

major contention between the parties.

Even before the separation, Paige was struggling financially as evidenced by the fact that

three of his cars (including a high-end BMW and a high-end Mercedes-Benz) were repossessed,

and he owed hundreds of thousands of dollars in past due taxes among other debts.  Paige also

went through a divorce from his wife, Allene, and pursuant to the May 17, 2005 divorce decree,

Paige no longer had any interest in the home he shared with Allene in Draper, Utah.[17]

Accordingly, after the joint venture with Colt failed, Paige began to explore other options to

---

[15]   Ex. 35.

[16]   *Id*. (emphasis added).

[17]   Ex. 553.

realize value for himself and his companies through the sale of the Domain Name and other business assets.

Around August 2005, Paige entered into discussions with Chad Sayers ("Sayers"), the president of PSNet Communications, Inc. ("PSNet"), regarding a potential joint venture or a merger of CCS entities with PSNet. Before these negotiations materialized into a formal agreement, however, Paige filed for chapter 7 bankruptcy relief on September 16, 2005 (the "Main Bankruptcy Case"). Jubber was appointed as the chapter 7 trustee. At the time, Paige was the sole owner of CCS, LLC. Although he listed his ownership interests in CCS, LLC and CCS Financial in his bankruptcy statements and schedules, he did not list the Domain Name or his tax debts in his statements and schedules.[18]

B.    The Post-Petition Transfers and Changes in the Domain Name's Ownership

After his bankruptcy filing, Paige continued his negotiations with Sayers for the sale of CCS assets to PSNet. Both Sayers and Neil Crabtree ("Crabtree"), a legal consultant for PSNet, knew of Paige's bankruptcy at the time Sayers engaged in negotiations with him. In fact, Sayers recommended that Paige talk with Stephen Enderton ("Enderton"), a Utah attorney, about his bankruptcy case. Sometime between September and October 2005, Paige moved CCS operations into PSNet's offices.

Around this same time, Paige also engaged in discussions with May and his company SMDI, and others regarding the sale of the Domain Name. May had expressed interest in the Domain Name in the past and had contacted Paige about purchasing it in 2001. At that time he determined that Paige owned the Domain Name by conducting a WHOIS search and had kept

---

[18]    Ex. 41 at 9, 16, 19-24 (Original Schedules).

Paige's contact information.  On October 19, 2005, May sent Paige an email inquiring whether Paige still owned the Domain Name and whether he was interested in selling it.[19]  A telephone call followed between May and Paige wherein Paige offered to sell the Domain Name together with a credit score algorithm (also referred to as a "FICO calculator") for $1 million.  As May did not have a million dollars at the time, he explored other possible business arrangements with Paige.

On November 3, 2005, May traveled from California to Utah to meet Paige regarding the potential purchase of the Domain Name.  The next day, May sent an email to Paige memorializing their preliminary agreement for a two-part arrangement whereby May would purchase the Domain Name from Paige for $140,000 and would pay him competitive royalties for using his "credit scoring model" in the products developed by May's business.[20]  Following the meeting in Utah, May set up an escrow through Escrow.com to facilitate the transfer of the Domain Name.[21]  On November 7, 2005, Paige sent an email to May asking him to put together an agreement outlining the terms of the Domain Name sale that would include, among other things, the following language: "should the event fee structure fall overdue 90+ days the *domain name will be returned to me*."[22]  The Court notes that the parties' written communications reflect that the Domain Name belonged to Paige personally.

---

[19]     Ex. 43.

[20]     Ex. 45 (11/4/05 email from May to Paige).

[21]     *Id.*; Tr. from 4/17/09 at 38:9-21, 47:5-17.  Private escrows like this are often used for the transfer of domain names.  Upon notice that the domain name has been transferred to the escrow, consideration is then passed to the seller whereupon the escrow transfers the domain name with the appropriate username and password necessary to access the name to the buyer.

[22]     Ex. 47 (emphasis added).

May and Paige continued to discuss and negotiate the terms of their agreement over the course of several days and scheduled another meeting in Utah on November 11, 2005. While these negotiations were taking place, Paige sent an email to his friend Stephen Taylor ("Taylor") stating: "I am selling an $8.00 domain name for $140,000 plus I can get a residual on all sales and can use the leads for CCS."[23]  This email shows that Paige considered himself as the owner of the Domain Name and expected to keep the monetary proceeds from the sale of the Domain Name for himself.

On November 11, 2005, May met with Paige for the second time.  The meeting was also attended by Brennan Scott ("Scott"), an employee of SMDI who was to review the technical matters relating to the use of the FICO calculator, and Sayers who attended only part of the meeting.  Paige and May did most of the talking at that meeting.  During the first meeting, May was informed that CCS was going to merge with PSNet.  Thus, when May came to the second meeting he brought with him a cashier's check for $140,000 made out to PSNet.[24]

On November 12, 2005, May sent Paige an email offering to purchase the Domain Name for $225,000 "no strings attached."[25]  He indicated that once he received the Domain Name, he would fly to Salt Lake City and hand Paige the $225,000 "in cash" and that Paige could do whatever he wanted with the funds.[26]  May further stated that he would not work with PSNet and

---

[23]     Ex. 328 (11/08/05 email chain between Paige and Taylor).

[24]     Ex. 591; Tr. from 4/17/09 at 151:8-20.

[25]     Ex. 49 (11/12/05 email from May to Paige).

[26]     *Id.*

11

Sayers.[27]  Numerous phone calls took place between May and Paige over the next few days.[28]

On November 15, 2005, Paige replied to May's offer stating that May's proposal was "too risky" and explained that PSNet had to be part of the transaction to "protect" him."[29]  Each party has presented conflicting interpretations of this phrase.  At trial, Paige testified that what he meant by this phrase was that he believed he could trust Sayers and wanted him involved to look out for CCS's interests.[30]  At the time that the statement was made, however, there was no formal offer or agreement with PSNet regarding the sale of CCS assets and/or the Domain Name.  Moreover, in his earlier testimony Paige stated that he did not intend to sell the CCS assets or the Domain Name to PSNet. [31]

On November 16, 2005, after several telephone and email discussions with Paige regarding the terms of the sale, May sent an email to Paige stating "I agree to purchase www.freecreditscore.com for the sum of $225,000 US from *Steve Paige*."[32]  Nevertheless, after conducting a WHOIS search several days later, May discovered that Conklin was listed as the administrator for the Domain Name.[33]  On November 21, 2005, believing that he had been the subject of misrepresentations by Paige as to the ownership of the Domain Name, May informed

---

[27]     *Id*.

[28]     Ex. 178 (May's phone bill at 5, line 26-28).

[29]     Ex. 51.

[30]     Tr. from 12/5/08 at 152:11-153:18.

[31]     *Id*. at 153:18-154:9.

[32]     Ex. 57 (emphasis added).

[33]     Tr. from 4/17/09 at 47:18-22; Pretrial Order, Ex. B.

Paige that the agreement was canceled.[34]  At the same time, believing Conklin to be the legitimate

owner of the Domain Name, May offered to purchase it from Conklin for $140,000.[35]

After receiving May's email canceling the Paige transaction, Paige immediately undertook

efforts to regain May's confidence and the prospective sale.  Paige arranged for a copy of the Colt

Separation Agreement to be faxed to May, which was received by May on November 21, 2005.[36]

That same day, PSNet as "Buyer" and "*CCS Financial, LLC*" and CCS, LLC as "Seller" entered

into an Asset Purchase Agreement ("PSNet APA") in which PSNet agreed to purchase all of the

assets and property of the "Seller," including "all intellectual property . . . and any additional

credit related assets and/or software public or proprietary owned by the Seller, *Steve Paige* or

their associates including the internet domain name 'freecreditscore.com.'"[37]  The PSNet APA

was only signed by Chad Sayers as "President" of PSNet and Steve Paige as "Managing

Member" of "*CCS Financial, LLC*/Consumer Credit Services, LLC."[38]  Paige *individually* was

not a party to the PSNet APA because he neither signed it nor was he named as a seller.[39]

Similarly, CCS Financial (which is not the same entity as "CCS Financial, LLC") was also not a

party to the agreement.[40]

---

[34]    Ex. 62.

[35]    Ex. 64.

[36]    Ex. 67.

[37]    Ex. 44 (emphasis added).

[38]    *Id*. (emphasis added).

[39]    *Id*.

[40]    *Id*.  Note that CCS Financial has been defined in this decision as "CCS Financial,
Inc."  There is no documentation to evidence that CCS Financial, Inc. merged into CCS

May was not given the PSNet APA but was told by Paige that PSNet had purchased CCS's assets. Based on his review of the Colt Separation Agreement and the representations made by Paige and Crabtree regarding the ownership of the Domain Name, May believed that the Domain Name belonged to Paige and resumed his negotiations with him. By the end of the day on November 21, 2005, Paige and May were again exchanging emails regarding the proposed sale.[41] Shortly thereafter, Sayers contacted Conklin to obtain the necessary username and password to change the registrant information in the Network Solutions records. On November 24, 2005, the Domain Name registrant was changed from Conklin to Sayers.[42] The Networks Solutions records were also amended to show Sayers and then PSNet as the administrative contact.[43]

May and Paige continued their negotiations for the sale of the Domain Name until the end of December 2005. In his discussions with Paige, May also included Sayers who May understood to be the president of PSNet. For PSNet, an important aspect of the proposed transaction was reaching an agreement for a long-term relationship between PSNet and May's company for the cross-promotion of consumer credit services.[44] May, on the other hand, wanted his company,

---

Financial, LLC or CCS, LLC. In fact, both CCS, LLC and CCS Financial continued to maintain separate bank accounts, payroll, and employees during the relevant periods, and paid bills out of their respective bank accounts. Tr. from 4/15/09 at 209:14-213:16; 217:7-14.

[41]   Ex. 65.

[42]   Pretrial Order, Ex. B.

[43]   *Id.*

[44]   Ex. 72 (12/9/05 email from May to Sayers and Paige describing the services that SMDI would provide to PSNet under the proposed agreement); Ex. 79 (12/21/05 email from Sayers to May).

SMDI, to own rights to the Domain Name free and clear, and if there was to be a continuing relationship with PSNet, he wanted the ability to opt out of it for a cash payment.[45]

Despite being aware of the PSNet-CCS merger and having engaged in some discussions with Sayers, May continued to view the Domain Name as Paige's personal asset. On December 6, 2005, he sent an email to Paige offering *again* to purchase the Domain Name for $225,000 from Paige directly, without any mention of CCS or PSNet.[46] May admitted that at the time of this email he was trying to acquire the Domain Name without Sayers' and PSNet's involvement.

Over the next couple of days, May and Sayers exchanged several emails wherein Sayers wanted a commitment from May that he would promote PSNet's business and would provide PSNet leads from the use of the Domain Name.[47] In one email to Sayers, with a copy to Paige and Scott, May expressed his concern about the Domain Name's ownership, stating "[p]lease understand that with all the problems with the clear ownership of the domain *freecreditscore.com* that the . . . credit repair leads commitment will not be valid until *freecreditscore.com* is in my control and I receive a notarized document signing off title and ownership of the domain to either PSNet, Chad Sayers, or Steve Paige."[48] At this point of the negotiations, May believed that any one of these individuals/entities could have owned the Domain Name but, in any event, it was not CCS.

---

[45]   Ex. 72.

[46]   Ex. 70.

[47]   Exs. 72 and 73.

[48]   Ex. 72.

15

As the negotiations between May, Paige, and Sayers continued, the United States Trustee ("U.S. Trustee") filed a Motion to Extend Time to Oppose Discharge in the Main Bankruptcy Case on December 19, 2005.[49]  In the motion, the U.S. Trustee stated that it was contacted "by an anonymous source regarding concerns with the Debtor's Statement of Financial Affairs and Schedules, and specifically undisclosed assets of the estate."[50]  Paige was served with the motion on January 24, 2006.[51]  This action by the U.S. Trustee is critical because it bears on the veracity of the statements made by Paige subsequently.

The loan transaction between Sayers and Mark Timothy ("Timothy"), another defendant in this case, should be addressed at this juncture.  In addition to his credit repair business, Sayers was also involved in residential acquisitions in Las Vegas and reportedly needed a loan to close some house deals.  On or around December 19, 2005, Sayers through Crabtree approached Timothy to borrow $9,000.  Originally, the loan was to be secured by a truck.  However, Crabtree told Timothy that Sayers/PSNet owned the Domain Name and advised Timothy that he could take it as collateral for the loan as well as use the Domain Name to secure repayment of previously loaned amounts.  It appears that in addition to the $9,000 loan, Sayers may have owed Timothy another $13,000 or more on prior loans and obligations.  Timothy asked Crabtree, who had graduated from law school in 2004 but was never admitted to the bar, to draft an agreement memorializing the terms of the loan transaction.

---

[49]      Main Bankruptcy Case (Docket No. 21).

[50]      *Id.*

[51]      Main Bankruptcy Case (Docket Nos. 24 and 25).

On December 19, 2005, Crabtree emailed Sayers the terms of the proposed loan agreement, which stated that Sayers and/or PSNet would "assign the URL 'freecreditscore.com' to [Timothy] as collateral" for a $22,000 loan to be repaid "on or before December 28, 2005.[52] Sayers and/or PSNet further agreed "to provide [Timothy] the username and passwords to the [Domain Name], so that [Timothy] may access it and have control and all right of ownership, if the [loan] is not paid in full by the due date . . . ."[53]  The loan amount was apportioned as follows: $9,000 would be given at the time of the signing of the loan agreement; $8,000 was allegedly for a prior loan made by Timothy to PSNet; $3,000 was for interest; and $2,000 was allegedly an amount Sayers owed to Crabtree.[54]  On December 20, 2005, Sayers, without Paige's authorization or knowledge, agreed to the terms of the loan agreement, and gave Timothy the username and passwords to the Domain Name.  Around the same time, PSNet issued three checks in favor of Timothy totaling $21,000, to be applied towards Timothy's loan.[55]  Timothy cashed one of the checks in the amount of $11,000 on January 3, 2006,[56] and that same day wrote a check to Crabtree for $2,000.

On December 21, 2005, the communications between Sayers, May and Paige resumed. May sent an email to Sayers, with a copy to Paige, stating that he needed to have a written

---

[52]  Ex. 610.

[53]  *Id*.

[54]  *Id*.

[55]  Exs. 74, 75, 76.

[56]  Ex. 87.

agreement in place for the sale by December 28; otherwise, the deal was off.[57]  Sayers replied

with a less than cordial email expressing his distrust of May and noting that while Paige may need

the money PSNet does not and that it owns the Domain Name.[58]  Sayers then counter-offered with

$275,000, which May rejected in a subsequent email.[59]  On December 22, 2005, May sent another

email to Sayers, with a copy to Paige, offering to purchase the Domain Name "straight up" for

$225,000 and reiterating his concerns about the ownership.[60]  The negotiations between May,

Paige and Sayers towards the end of December 2005 ended on less than cordial terms, especially

between May and Sayers.

On or around December 30, 2005, the Trustee learned, for the first time, that Paige had not

disclosed certain assets in his bankruptcy schedules from an email by an anonymous tipster who

identified himself to the Trustee only as THIRSTY 4 JUSTICE.  Following on the anonymous tip,

the Trustee sent a letter to Escrow.com on January 4, 2006, notifying it of Paige's interest in the

Domain Name, and advising that the Domain Name was property of the bankruptcy estate and

could not be sold without court approval.[61]  That same day, Sayers forwarded an email to Paige

from Enderton, which stated that the U.S. Trustee was seeking an extension of time to object to

Paige's dischage based on the information that the U.S. Trustee had received from an anonymous

source regarding certain undisclosed assets.  Enderton further cautioned Sayers that this could

---

[57]     Ex. 78.

[58]     Ex. 79.

[59]     *Id.*; Ex. 80.

[60]     Ex. 83.

[61]     Ex. 90.

18

relate to an asset that Sayers was looking to purchase, presumably referring to the Domain Name. Sayers sent a follow-up email to Paige, stating: "[f]or your sake it is a good thing that we did not sell the domain. Now the trustee will be looking for things and may well investigate you AND PSNet and that annoys the crap out of me!"[62]  At the time of these emails, Paige was unaware that Sayers/PSNet had pledged the Domain Name as collateral for a loan.

On January 6, 2006, Timothy, with the help of Charles Schmidt (aka Steve Cantano) (hereinafter "Schmidt"), a Las Vegas resident with experience in marketing domain names, changed the Domain Name registration from PSNet to Promarketing Network, Inc. ("Promarketing"), one of Timothy's companies, without Paige's knowledge or consent.[63] Timothy knew of Paige's claim to the Domain Name prior to January 6, 2006, both through his own research and from his discussions with Sayers and Crabtree.[64]  He was also aware of Paige's personal bankruptcy when he asked Schmidt to transfer the Domain Name from PSNet to Promarketing.

Immediately after taking the Domain Name, Timothy, with Schmidt's help, began marketing the Domain Name for sale.  Schmidt testified that Timothy told him to "liquidate" the Domain Name as quickly as possible for whatever he could get for it.[65]

On January 10, 2006, Scott received an email from "Disgruntled" at "Ad Honcho" informing him that the Domain Name was back with its "true owner" and that it was "for Sale to

---

[62]      Ex. 91.

[63]      Pretrial Order, Ex. B.

[64]      Tr. from 3/20/09 at 118:2-18; 210:17-19.

[65]      Tr. from 3/19/09 at 229:21-230:9.

Someone Real."[66]  Scott shared this email with May who did not recognize the sender but

believed it to be Sayers.  After conducting a WHOIS search, May learned that Promarketing was

purporting to be the registered owner.  On January 12, 2006, using the contact information in the

WHOIS records, May emailed Promarketing to inquire whether the Domain name was, in fact, for

sale.[67]  Schmidt, using the alias Steve Cantano, responded to May informing him that bids were

being accepted until "Wednesday, Jan. 13th," and that May could participate in the auction by

executing a non-disclosure agreement ("NDA").[68]  Schmidt subsequently clarified that the

reference to the "13th" was a "typo" and that the bidding deadline was the 18th.[69]

Between January 14 and 17, 2006, May communicated with Schmidt several times via

email, facsimile, and telephone, seeking clarification as to the ownership of the Domain Name

and how Timothy/Promarketing acquired it.[70]  May indicated to Schmidt that he was aware of

several changes in the Domain Name over the past several months, stating: "I have talked to

several people late last year who claim they have ownership/control of the Domain Name,

therefore a very confusing situation."  He also requested that Schmidt disclose his role in the

auction.[71]  Schmidt responded that he would address May's concerns after he received the signed

---

[66]    Ex. 162.

[67]    Ex. 93.

[68]    Ex. 94.

[69]    Ex. 96.

[70]    Exs. 100, 101, 102, 103, 104, 105, 106, and 109.

[71]    Ex. 100.

NDA.[72]  May immediately signed and returned the NDA to Schmidt and again requested

clarification regarding the ownership.[73]

While waiting for a response from Schmidt, May contacted Paige and informed him that

May intended to participate in an auction to purchase the Domain Name and asked whether he

could submit his bid on January 18.[74]  Paige told May that he knew nothing about the auction and

that the Domain Name should not be for sale.[75]  It is apparent from this testimony and from other

evidence that this was the first time that Paige had learned of the auction.

After the phone call with Paige, May was contacted by Schmidt who told May that

Timothy owned Promarketing, that Schmidt was assisting Timothy with the Domain Name sale,

and that Timothy got the Domain Name from Sayers as collateral for an unpaid debt.  Shortly

after this phone call, May sent an email to Schmidt asking for a short history of changes in the

Domain Name's ownership.[76]  May also asked for a written certification from Timothy that he

owned the Domain Name free and clear of any liens.[77]  Schmidt assured May that he and Timothy

---

[72]    Ex. 101.

[73]    Ex. 102.

[74]    Ex. 178 (May's phone bill at 4, line 30).  The phone call between May and Paige
took place on January 14, 2006, at 1:08 pm and lasted for 27 minutes.  *See also* Ex. 150 (an
audio recording of a 9/16/06 meeting between Paige, May and Adam Affleck, counsel for the
SMDI Defendants, wherein Paige repeated what he had said to May during their January 14,
2006 phone conversation).

[75]    Tr. from 1/6/09 at 24:1-24; 65:22-66:3.

[76]    Ex 103.

[77]    *Id*.; Ex. 106.

would provide him with the requested information,[78] and based on these assurances May

submitted a bid to purchase the Domain Name from Timothy for $350,000 on January 17.

Timothy accepted May's offer that same day.[79]

      As the communications between May and Schmidt continued, Paige contacted his then

lawyer, Lonnie Eliason ("Eliason"), about making a demand on PSNet to return the Domain

Name.  On January 17, 2006, Eliason, based on the information provided to him by Paige, sent a

letter to Sayers demanding that he immediately return the Domain Name to "CCS, LLC."[80]

Although the letter requested that the Domain Name be returned to "CCS, LLC," Paige later

acknowledged at his meeting of creditors that it was, in fact, to be put back in his name because

he, not CCS, owned the Domain Name.[81]  This is consistent with the last paragraph of the letter,

which stated that "these items [referring to the Domain Name and other domain names] are all

part of the bankruptcy estate."[82]  The letter also stated that "[a]t no time has Mr. Paige approved

of any transfer of this name to any third party."[83]  Sayers acknowledged that as of the date of this

---

[78]     Ex. 104.

[79]     Ex. 105.

[80]     Ex. 110.  At trial, Eliason testified that he did not have independent knowledge of
the PSNet-CCS transaction or that CCS had any interest in the Domain Name, and that his
understanding of this transaction came directly from Paige.

[81]     Specifically, Paige, who was represented by Mr. Noel Hyde at the time, testified
that he believed that he owned the Domain Name as of the Petition Date.  When Mr. Hyde was
asked whether Paige was going to amend his schedules to reflect this fact, he concurred.  Shortly
thereafter, Mr. Hyde withdrew as counsel and Paige's bankruptcy schedules were never amended
to include the Domain Name.

[82]     Ex. 110.

[83]     *Id*.

letter, he had no ownership interest in the Domain Name, that he was not authorized to transfer it to anyone else, and that he was to put it back in Paige's name.

This letter assists the Court in finding that both Paige and Sayers believed that the Domain Name was Paige's personal asset and, therefore, property of the estate. The Court further notes that at the time the Eliason letter was sent, Paige was aware that his discharge was being delayed and that the Trustee/U.S. Trustee was investigating his bankruptcy filing. Thus, with this letter, he wanted to ensure that in the event the Trustee discovered this transfer, he would be cleared of any non-disclosure of the Domain Name and any other wrongdoing.

Between January 17 and January 18, 2006, May had several phone conversations with Timothy regarding the latter's involvement with the Domain Name. During these phone calls, Timothy purportedly told May that he received the Domain Name as consideration for a loan he made to Sayers. Both Timothy and May testified that Timothy did not disclose the amount that Sayers owed to him. Timothy subsequently executed a sworn statement of Representations and Warranties that May had provided certifying his ownership of the Domain Name.[84] May, however, never received the history of changes to the Domain Name ownership that he requested.

On January 18, 2006, May proceeded forward with the purchase through Escrow.com, and transferred the Domain Name's registration into his name, and then to SMDI's once the sale closed.[85] After SMDI acquired the Domain Name, it licensed its use to Magnet Media, Inc. ("Magnet Media"), another company owed by May. Within a week of the Domain Name's

---

[84]      Ex. 113.

[85]      *See* Ex. 115 (an Escrow.com receipt showing payment of $350,000 from May to Timothy for the Domain Name); *see also* Pretrial Order, Ex. B (showing that the records of Network Solutions were changed to reflect May and then SMDI as the "Registrant" and "Administrative Contact" for the Domain Name).

purchase, Magnet Media began generating significant daily revenues from its use of the Domain Name.[86]  The Plaintiffs have attempted to use these revenues to support their claim for damages against the SMDI Defendants.  The Court will address the issue of damages later in this Memorandum Decision.

C.    Relevant Proceedings and Determinations in the Main Bankruptcy Case

Before the denial of discharge action was commenced, the U.S. Trustee and Jubber had examined Paige over the course of two days pursuant to a Rule 2004 examination.  This examination occurred after Jubber received the anonymous email from THIRSTY 4 JUSTICE tipping him off that there was an undisclosed domain name in Paige's estate.[87]  In that examination, Paige described the Domain Name as "his domain name," implying that it was his personal asset.  Although in other examinations and in portions of his trial testimony Paige stated otherwise, the Court finds the above statement about the ownership of the Domain Name more credible.

On February 8, 2006, the Court entered an order extending the deadline for filing complaints concerning the Debtor's discharge, extending the time to file a motion to dismiss or a complaint through and including March 20, 2006.[88]  In the meantime, the Trustee's investigation revealed that Paige may have an interest in the Domain Name that was now held by May/SMDI, and the Trustee requested that May/SMDI turn over the Domain Name.  As previously stated, the Trustee's interest in this matter was spurred in significant part by the unsolicited email from

---

[86]    Pretrial Order, Ex. G (sealed).

[87]    Ex. 88.

[88]    Main Bankruptcy Case (Docket No. 32).

THIRSTY 4 JUSTICE dated December 30, 2005, which stated that Paige had an undisclosed

asset in the form of a valuable domain name.[89]  Accordingly the Trustee began in earnest to seek

to retrieve the Domain Name.  When May and SMDI refused to turn over the Domain Name, the

Trustee commenced this Adversary Proceeding to recover it and for other related relief, including

declaratory relief that the Domain Name was property of the estate as of the Petition Date.  On

May 19, 2006, the U.S. Trustee commenced its own adversary proceeding against Paige to deny

his discharge under 11 U.S.C. § 727[90] for failure to disclose the Domain Name and false oaths

(the "Denial of Discharge Action").[91]

On September 16, 2006, while the Adversary Proceeding was ongoing, Paige was

questioned by one of May/SMDI's attorneys regarding the ownership of the Domain Name and

the meaning of the phrase "back to CCS" in the Colt Separation Agreement (the "September 2006

meeting").[92]  During extensive questioning by one of SMDI's attorneys, Paige explained that the

phrase "back to CCS" meant back to him personally and gave clear and detailed reasons in

support of that statement.[93]  When asked whether there were any factual basis for the claim that

CCS, LLC or CCS Financial owned the Domain Name, Paige replied: "No.  And let me tell you

---

[89]     Ex. 88.

[90]      Unless otherwise noted, all subsequent statutory references are to Title 11 of the
United States Code.

[91]     The Denial of Discharge Action was dismissed on November 19, 2008.

[92]      The meeting was held at the offices of May/SMDI's counsel, Prince, Yeates &
Geldzahler, and was attended only by May, Paige, and Adam Affleck, one of the attorneys for
May/SMDI.  Mr. Affleck recorded the meeting, and the transcript of that audio recording has
been admitted into evidence.

[93]     Ex. 150.

why I come to that conclusion.  Because I bought the domain name under Steve Paige.  I didn't

buy it under CCS.  It came out of my personal account.  It didn't come out of CCS, it came out of

my credit card."[94]  Paige also clarified that he did not authorize the transfer of the Domain Name

to Sayers/PSNet, and when he demanded that Sayers return it, he intended for it to go back to him

rather than CCS.[95]

On October 6, 2006, Paige retained counsel, and sought and obtained conversion of his

The Court does not believe that Paige had a motive to lie when he made the statements at

the September 16 meeting.  The statements also appear to be consistent with the representations

he made to Eliason and to the Trustee at his Rule 2004 examination.  The Court further finds the

statements made at the September 16 meeting reliable and helpful on the issue of ownership.

On October 6, 2006, Paige retained counsel, and sought and obtained conversion of his

case from chapter 7 to chapter 11.[96]  Jubber immediately moved to reconvert the case to chapter 7,

but the Court denied his motion.  Instead, the Court ordered the appointment of a chapter 11

trustee,[97] and Jubber was appointed to serve in that capacity.

After the case was converted to chapter 11, the Trustee filed a motion to approve the sale

of the Domain Name and related assets, including a co-interest in the Adversary Proceeding to

ConsumerInfo.[98]  SMDI submitted a competing bid in the form of settlement offers and objected

to the proposed sale to ConsumerInfo.  In response, ConsumerInfo modified its original offer to

---

[94]     *Id.*

[95]     *Id.*

[96]     Main Bankruptcy Case (Docket Nos. 94, 95, and 98).

[97]     *Id.* at No. 124.

[98]     *Id.* at No. 151.

provide for payment of $1.9 million in cash plus a commitment to fund up to $200,000 of additional litigation expenses.[99]

After conducting a hearing on the Trustee's motion to sell, the Court issued a detailed memorandum decision granting the motion.[100]  The Court subsequently entered an Order Authorizing Sale of Domain Name Related Assets (the "Sale Order") on December 12, 2006.[101] The Sale Order, among other things, approved the Asset Purchase Agreement between the Trustee and ConsumerInfo (the "ConsumerInfo APA") which provided for the sale of all of the estate's rights related to the Domain Name.[102]  The Sale Order was not appealed.  Pursuant to the ConsumerInfo APA, ConsumerInfo funded $1.9 million into the estate plus the $200,000 that it had promised for the litigation expenses related to the Adversary Proceeding at the initial closing.

Under the ConsumerInfo APA and the Sale Order, ConsumerInfo was granted a co-interest in the Adversary Proceeding and a 25% interest in the net monetary recoveries obtained by the Trustee.[103]  Additionally, the ConsumerInfo APA required that the Trustee prosecute the Adversary Proceeding in good faith, and if the Trustee was successful in proving that the Domain Name was property of the estate, or otherwise recovered the Domain Name, he would be required

---

[99]    Ex. 237.

[100]    Ex. 538.

[101]    Ex. 237.

[102]    *Id.*

[103]    *Id.*

27

to deliver the Domain Name to ConsumerInfo.[104]  The ConsumerInfo APA did not contemplate the delivery of value of the Domain Name in lieu of the Domain Name itself.

After the Court approved the ConsumerInfo APA, ConsumerInfo purchased CCB claims, and, thereafter, filed claim 42 with the Court.[105]  Claim 42 asserted a general unsecured claim against the estate in the amount of at least $2.1 million.  Claim 42 was premised on the theory that Paige had converted the Domain Name from CCB.  At trial, the SMDI Defendants argued that ConsumerInfo should be barred from asserting that the Domain Name is property of the estate because this position is inconsistent from the one ConsumerInfo took in Claim 42.  The SMDI Defendants also introduced the testimony of Rick Anderson and others to show that CCB Data and not Paige owned the Domain Name prior to Paige's bankruptcy filing.

The Court will not give much weight to this evidence nor address the estoppel argument against CosumerInfo because the SMDI Defendants did not brief this issue in their trial briefs.  In fact, their position throughout this trial has been that CCS, not CCB, owned the Domain Name. The Pretrial Order makes it clear that parties cannot make legal arguments that they have not briefed.[106]

---

[104]    *Id*.

[105]    Ex. 313 (Claim 27), Ex. 314 (claim 42), and Ex. 242 (Claims 27 and 42). ConsumerInfo acquired an existing claim (Claim 27) in the amount of $131,800, and asserted a new claim for $2.1 million (Claim 42).

[106]    Adversary Proceeding (Docket No. 254).  Section 7 of the Pretrial Order provides, among other things, that the parties "shall specify in the trial briefs all laws (statutes, cases, etc.) which will be argued to the court or upon which counsel intend to rely."  The SMDI Defendants filed two trial briefs, and in neither brief do they assert that ConsumerInfo should be estopped from arguing that the Domain Name is property of the estate because of its position in Claim 42, or that CCB Data was the owner of the Domain Name.

The Court, therefore, finds that under the terms of the Pretrial Order, the SMDI

Defendants have waived their arguments on these issues.

The Court also finds it puzzling for the SMDI Defendants to now argue that

ConsumerInfo should be estopped from changing its position, when they took an opposite

position at the Claim 42 estimation hearing in the Main Bankruptcy Case.  At trial they have

argued that the Debtor has no interest in the Domain Name because the Domain Name was

owned, at all relevant times, by CCS.  However, on June 8, 2007, the SMDI Defendants moved to

estimate Claim 42 on the basis that the Debtor and not CCB was the registered owner of the

Domain Name at all relevant times.  The Court accepted their position and ruled that CCB Data

had no viable claim against the Debtor or the estate for conversion of the Domain Name,

notwithstanding the fact that CCB Data had been using the Domain Name as part of its business.

Based on that finding, the Court reduced the estimated amount of Claim 42 from $2.1 million to

$225,000.  Although the Court limited its ruling for confirmation purposes only, the fact remains

that like ConsumerInfo, the SMDI Defendants have taken a position at trial that is different from

the one they had previously asserted.

On May 23, 2007, SMDI proposed a chapter 11 plan (the "SMDI Plan"), and the Trustee

and ConsumerInfo proposed a joint, competing plan (the "Joint Plan").[107]  The Court conducted a

seven-day trial on confirmation of both plans and subsequently confirmed the Joint Plan on

October 18, 2008 ("Confirmation Order").[108]  The Court also issued a detailed memorandum

---

[107]     Main Bankruptcy Case (Docket Nos. 262, 318, and 331).

[108]     *Id.* at No. 584.  A stay of the Confirmation Order was sought at the Bankruptcy
Court and the District Court and was denied in both instances.  The SMDI Defendants appealed
the Confirmation Order to the District Court.  The District Court affirmed.  That order is now on
appeal to the Tenth Circuit Court of Appeals.

decision discussing both plans and the reasons for confirming the Joint Plan.[109] The findings and

conclusions made in that memorandum decision are incorporated herein. Under the Joint Plan,

the Adversary Proceeding vested in a liquidating trust (the "Liquidating Trust"), and Jubber

became the Liquidating and the Plan Trustee.[110] As of the confirmation date, there were

substantial unpaid claims held by multiple creditors.[111] All allowed, undisputed claims have been

paid under the Joint Plan. As previously stated, the Joint Plan provided for the continued

prosecution of the Adversary Proceeding. However, additional funding beyond what the estate

had on hand from the sale was necessary to prosecute the Adversary Proceeding and to pay the

creditors in full. In consideration of the terms of the Joint Plan and the Liquidating Trust,

ConsumerInfo agreed to pay several hundred thousand dollars more to the estate and to

subordinate its CCB claim. The Court finds that the payment of claims pursuant to the Joint Plan

constituted a benefit to the estate and the creditors.

The Trustee also objected to various proofs of claims and reconciled tax claim amounts.[112]
Certain third-party creditors, such as the taxing authorities, were paid well after the effective date

of the Joint Plan, as were certain chapter 11 administrative claims. The claims of PSNet, which is

disputed, and ConsumerInfo remain unpaid. The Joint Plan has been substantially consummated,

and ConsumerInfo has funded its additional obligations thereunder.

---

[109]    Ex. 534.

[110]    Exs. 238 and 239.

[111]    Exs. 240, 242, and 506(c).

[112]    Exs. 238, 239, 240, 506(c), 557, 559, 560, and 561.

D.      The Adversary Proceeding and Related Matters

As previously stated, the Trustee filed this Adversary Proceeding on May 18, 2006.  On June 30, 2006, the SMDI Defendants filed a motion to dismiss the Adversary Proceeding.  After some delay, that motion was withdrawn, and they filed their first answer to the original complaint in the Adversary Proceeding.

In May 2007, the SMDI Defendants filed another motion to dismiss the Adversary Proceeding for failure to join ConsumerInfo as a defendant, arguing that ConsumerInfo was a necessary party because its competing claim to ownership of the Domain Name was adverse to that of SMDI and the estate.[113]  After a hearing, the Court granted the SMDI Defendants' motion and ordered that ConsumerInfo be joined as a defendant; otherwise, the Adversary Proceeding would be dismissed.[114]  After the Court's ruling, ConsumerInfo waived its claim to ownership of the Domain Name as against the estate.  Thereafter, the Trustee filed a Motion to Stay, or in the Alternative, Amend Ruling Regarding SMDI's Rule 12(b)(7) Motion, and sought permission to join ConsumerInfo as plaintiff.

On July 5, 2007, the Court granted the Trustee's motion and ordered that ConsumerInfo may be joined as a party plaintiff.  Shortly thereafter, the Trustee and ConsumerInfo as co-plaintiffs filed the first Amended Complaint on July 16, 2007.  In the Amended Complaint, the Plaintiffs, among other things, sought declaratory relief that the Domain Name was property of the estate on the Petition Date as well as pre- and post-petition, and asserted that the post-petition

---

[113]      Adversary Proceeding (Docket No. 40).

[114]      Ex. 543.

transfers of the Domain Name violated the automatic stay or, alternatively, constituted avoidable unauthorized transfers under §§ 549 and 550. The Plaintiffs also asserted a claim for avoidance and recovery against Conklin for the pre-petition transfer of the Domain Name as well as a state law conversion claim against all of the defendants. The Court will address the relevant causes of action in the Discussion section of the opinion.

The SMDI Defendants filed their answer to the Amended Complaint on July 26, 2007. Sayers and PSNet filed their answer on July 27, 2007. Defendants Conklin, Timothy, and Promarketing have not filed answers. Default certificates were subsequently entered against Timothy, Promarketing, and Conklin on various dates, but no default judgment was sought, nor entered previously.

On August 22, 2008, the Court issued an order finding that Count 7 (state law conversion claim) and Count 9 (turnover claim) were core proceedings.[115] On August 29, 2008, the Court entered a Pretrial Order which was agreed upon by the Plaintiffs and the SMDI Defendants.[116] None of the other defendants nor their counsel participated in the Final Pretrial Conference, and they were, therefore, precluded under paragraph 3(c) of the Pretrial Order from participating at trial, except to the extent that those Defendants could be called as witnesses. Additionally, section 7 of the Pretrial Order provided that "[c]ounsel shall specify in the trial brief all laws . . . which will be argued to the court or upon which counsel intend to rely. A party not filing or not

---

[115]     Adversary Proceeding (Docket No. 244).

[116]     *Id*. at No. 254.

timely filing a trial brief is deemed to have waived his right to oral argument of the law at trial

and/or to have conceded the legal issues in dispute . . . ."[117]

On October 15, 2008, the Plaintiffs and the SMDI Defendants filed their respective trial

briefs, and on October 27 they filed their respective reply briefs. None of the other defendants

submitted trial briefs or reply briefs. Accordingly, under the terms of the Pretrial Order the other

Defendants were precluded from substantively participating at trial or presenting any arguments

or defenses.

The trial commenced in this Adversary Proceeding on November 4, 2008, and lasted for

19 days, although not continuously.

## III.   DISCUSSION

### A.   The Plaintiffs' Post-Confirmation Standing

At trial, the SMDI Defendants argued that the Plaintiffs failed to meet their burden under

§ 1123(b)(3)(B) to prove that they have post-confirmation standing to prosecute the claims

asserted in the Adversary Proceeding.[118]  Section 1123(b)(3) states that a plan of reorganization

---

[117]      *Id*.

[118]      The Court previously considered the issue of ConsumerInfo's post-confirmation
standing at two pretrial hearings in this proceeding.  On November 4, 2008, the Court heard
arguments on this issue in the context of the Plaintiffs' Motion in Limine to Exclude Defendants
from Presenting Evidence and Argument on Issues that have Already Been Decided (the
"Motion in Limine").  The Court granted the Motion in Limine on the ground that it had
previously ruled on the issue of ConsumerInfo's standing.  That same day, prior to the hearing
on the Motion in Limine, the Court heard arguments on the SMDI Defendants' Motion for Order
Prohibiting ConsumerInfo's Participation at Trial (the "Motion to Enjoin"), which also addressed
ConsumerInfo's alleged lack of standing.  The Court denied the Motion to Enjoin on the merits,
finding, among other things, that it was untimely, that the SMDI Defendants were making a
statutory standing challenge, and that the challenge went to the merits rather than the Court's
subject matter jurisdiction.  The SMDI Defendants then filed a motion to reconsider the Court's
ruling on the Motion in Limine, arguing that the Court had never previously made a
determination on the merits regarding whether the Plaintiffs have satisfied their burden under §

may provide for "(A) the settlement or adjustment of any claim or interest belonging to the debtor

or to the estate; or (B) the retention and enforcement by the debtor, by the trustee, or by a

*representative of the estate* appointed for such purpose of any such claim or interest."[119]  Citing

the Tenth Circuit Court of Appeals decision of *Mako*,[120] the SMDI Defendants argued that §

1123(b)(3)(B) required the Plaintiffs to show (1) that they were "appointed" as representatives of

the estate and (2) that "a successful recovery by the appointed representative would benefit the

debtor's estate, particularly the debtor's unsecured creditors."[121]  The standard articulated in *Mako*

comes from another Tenth Circuit decision, *In re Sweetwater*,[122] and has become commonly

known as the "*Sweetwater* Test."

    The appointment prong of the *Sweetwater* Test can be satisfied by having language in the

confirmed plan that appoints a party to prosecute claims post-confirmation.[123]  The SMDI

Defendants conceded that the Trustee has satisfied this requirement because he was clearly

---

1123(b)(3)(B) to show that they have post-confirmation standing to prosecute the Adversary
Proceeding.  The Court agreed to reconsider the matter and allowed the SMDI Defendants to
present evidence and arguments on this issue at trial.  Having considered the evidence and
arguments presented at trial, the Court will now make a determination as to the Plaintiffs' post-
confirmation standing under
§ 1123(b)(3)(B).

[119]    11 U.S.C. § 1123(b)(3)(B) (emphasis added).

[120]    *Retail Marktg. Co. v. King (In re Mako, Inc.)*, 985 F.2d 1052 (10th Cir. 1993).

[121]    *Id.* (quoting *In re Sweetwater*, 884 F.2d 1323, 1326 (10th Cir. 1989)).

[122]    884 F.2d 1323 (10th Cir. 1989).

[123]    *Mako*, 985 F.2d at 1054.

appointed to pursue this Adversary Proceeding through the confirmed Joint Plan.[124]  They argued,

however, that ConsumerInfo lacked post-confirmation standing because it was not appointed to

enforce or prosecute the estate's claims as a representative of the estate. They emphasized that

nothing in the Joint Plan, the Confirmation Order, the memorandum decision confirming the Joint

Plan, or any other source suggests that ConsumerInfo was appointed or authorized to prosecute

the Adversary Proceeding jointly with the Trustee.

As stated above, § 1123(b)(3)(B) applies only to parties who have no independent basis

for standing and seek to assert the estate's interests and causes of action post-confirmation as

representatives of the estate.  Contrary to the Defendants' assertions, however, ConsumerInfo has

not attempted to become an estate representative or to prosecute claims in that capacity.  Rather,

ConsumerInfo derives its authority to prosecute this Adversary Proceeding from the

ConsumerInfo APA, the Sale Order, and the Joint Plan, in which it was granted a separate and

undivided co-interest in all of the claims asserted in this proceeding.

Specifically, paragraph 1.1(c) of the ConsumerInfo APA grants ConsumerInfo a co-

interest in the Adversary Proceeding.  As a result, ConsumerInfo has an ownership interest in

every claim pending in this proceeding.  Under the Sale Order, which approved the ConsumerInfo

APA, this Court authorized a sale from the estate to ConsumerInfo of an undivided co-interest in

all of the causes of action in this Adversary Proceeding, along with a 25% interest in any net

damage recoveries.  Importantly, although the Sale Order addresses certain rights that the Trustee

would retain notwithstanding the fact that ConsumerInfo had acquired these interests, the Sale

---

[124]    Under the Joint Plan, the estate's claims in the Adversary Proceeding were
transferred to the Liquidating Trust and Jubber, as the Liquidating Trustee, was appointed to
prosecute them.

Order does not preclude ConsumerInfo from participating in this Adversary Proceeding as a co-plaintiff. Although as of the date of the Sale Order ConsumerInfo was not a party to this Adversary Proceeding, the Sale Order and the ConsumerInfo APA clearly contemplated for this to occur by authorizing the Trustee to enter into a joint prosecution agreement with ConsumerInfo. The Sale Order is now a final and non-appealable order and is the law of the case.[125]

Notwithstanding the terms of the Sale Order and the related ConsumerInfo APA, ConsumerInfo became a party in this Adversary Proceeding not through its own volition but at the insistence of the SMDI Defendants. Early on in this Adversary Proceeding, the SMDI Defendants filed a motion to join ConsumerInfo as a necessary and indispensable party, arguing that failure to join ConsumerInfo would require a dismissal of this proceeding. The Court granted that motion and directed ConsumerInfo's joinder. Although in its original ruling the Court ordered that ConsumerInfo be joined as a co-defendant, the Court subsequently amended its ruling and authorized ConsumerInfo to be joined as a co-plaintiff. Now that the exigencies of the moment have changed, the SMDI Defendants have taken an opposite position and want ConsumerInfo dismissed. The Defendants should not be able to have it both ways.

Based on the foregoing, the Court concludes that ConsumerInfo, as a co-Plaintiff and a co-owner of the claims, need not rely on § 1123(b)(3)(B) to establish its standing in this Adversary Proceeding, and the Court specifically finds and concludes that ConsumerInfo has proper standing in this proceeding.

---

[125]    The law of the case doctrine "posits that '[w]hen a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1553 (10th Cir. 1991).

The SMDI Defendants also challenged the Trustee's standing under the second prong of *Sweetwater*. They argued that the Trustee lacked standing because even though he was appointed to pursue the Adversary Proceeding, the successful prosecution of the adversary claims will only benefit ConsumerInfo and none of the other creditors. They based this argument largely on the fact that under the terms of the Joint Plan and the Liquidating Trust, the Trustee cannot elect or voluntarily accept a monetary recovery in lieu of the Domain Name. Under the ConsumerInfo APA, if the Domain Name is recovered, the Trustee must assign it to ConsumerInfo for no additional consideration to the estate or the creditors. They further argued that to the extent any of the claims allow for damage remedies, the post-confirmation prosecution of such claims will solely benefit ConsumerInfo because it is the only creditor that is a beneficiary of the Liquidating Trust. In making this argument, the SMDI Defendants relied on a portion of the *Mako* decision where the court found that a non-debtor, non-trustee party lacked standing to prosecute avoidance actions on behalf of the estate where he was going to be the sole beneficiary of any successful recoveries from the defendants.[126]

In this regard, *Mako* is distinguishable on at least two grounds. First, unlike here, the party prosecuting the avoidance actions in *Mako* was neither the trustee nor the party designated in the plan to pursue those actions. In fact, the *Mako* court pointed out that the appellant lacked standing, in part, because the plan designated a litigation trustee to pursue those actions[127] whereas here, Jubber, as the Liquidating Trustee, was specifically appointed under the Joint Plan to pursue the Adversary Proceeding. Second, unlike the appellant in *Mako* who pursued the

---

[126] *Mako*, 985 F.2d at 1056.

[127] *Id*.

avoidance action in order to recoup the money it was required to pay under the plan to satisfy the administrative claims, the Trustee did not pursue this Adversary Proceeding to recoup funds that ConsumerInfo paid into the Joint Plan, but to fulfill his duties under the ConsumerInfo APA and the Sale Order.  Under the terms of this Court's final non-appealable Sale Order and the related ConsumerInfo APA, the Trustee has an obligation to prosecute this Adversary Proceeding.

In arguing that the prosecution of the Adversary Proceeding provides no benefit to the estate, the SMDI Defendants also ignore the substantial consideration that the estate received from ConsumerInfo under the Sale Order and the Joint Plan.  ConsumerInfo has already paid the estate well over $2 million and subordinated its CCB related claims so that all other creditors of the estate could be paid in full with interest, including SMDI and its affiliate Magnet Media.  It gave this in consideration for the legally binding commitments made to it under the ConsumerInfo APA and the Joint Plan, which required the prosecution of this Adversary Proceeding and the conveyance of the Domain Name to ConsumerInfo if the Trustee prevailed at trial.  As previously stated, the Trustee and ConsumerInfo also agreed that to the extent there were any monetary recoveries from the Adversary Proceeding, these would be shared between the parties with 25% going to ConsumerInfo and the balance going to the estate to pay existing and future estate obligations.  Without ConsumerInfo's infusion of cash, the creditors of the Paige estate would have received little if anything on account of their claims.

These transactions clearly benefitted the estate because they allowed the Trustee to pay all of the creditors (except for certain disputed claims) in full and provided a way for the Trustee to generate funds to be able to pay the subordinated CCB claims held by ConsumerInfo, the costs of administration of the Liquidating Trust, and perhaps even the Class 4 residual interest purchased

and held by SMDI, if monetary recoveries are obtained. The Court believes that in determining

post-confirmation standing, it is appropriate to consider not only future benefits but also past

benefits to the estate and the creditors.[128]

In light of the foregoing, the Court concludes that the pursuit of this Adversary Proceeding

has provided a benefit to the estate sufficient to confer post-confirmation standing on the Trustee

under § 1123(b)(3)(B) and the *Sweetwater* Test. Accordingly, the Trustee has appropriate

standing to pursue this Adversary Proceeding along with ConsumerInfo.

B.    The Domain Name is Property of the Paige Bankruptcy Estate

One of the fundamental issues in this case is the ownership of the Domain Name.

Questions such as whether the Domain Name was a personal asset of Paige, and therefore

property of the estate, or whether it was property of CCS or someone else must be addressed

before the Court can address the parties' claims and defenses. Indeed, all of the Plaintiffs' claims

in this Adversary Proceeding are contingent on the Court finding that the Domain Name belonged

to Paige individually.

---

[128]    *See, e.g.*, *In re Gonzales v. Congara Grocery Prods. Co. (In re Furr's Supermarkets, Inc.)*, 373 B.R. 691, 373 (10th Cir. BAP 2007) (interpreting "benefit to the estate" broadly and finding that trustee had standing to prosecute an avoidance action on benefit-to-the estate grounds even where the recovery would benefit only secured or administrative expense creditors and not generate any benefit to the unsecured creditors); *In re Churchfield Mgmt. & Inv. Corp.*, 122 B.R. 76, 82 (Bankr. N.D. Ill. 1990) (noting that courts have interpreted the benefit requirement broadly and holding that the benefit envisioned by § 1123(b)(3)(B) includes past benefits to the estate which might have occurred prior to the actual recovery on a claim pursued under that provision); *Tenn. Wheel & Rubber Co. v. Captron Corporate Air Fleet (In re Tenn. Wheel & Rubber Co.)*, 64 B.R. 721, 726 (Bankr. M.D. Tenn. 1986) (refusing to dismiss an avoidance action despite the fact that unsecured creditors had received a fixed distribution under the plan and stood to gain nothing more form the litigation because the debtor funded its plan with a line of credit secured by post-confirmation assets, including recoveries from the avoidance action, and further noting, "absent the post confirmation line of credit . . ., unsecured claimholders would have received no distribution.").

Before the Court delves into the merits of this issue, however, it must determine the appropriate legal standard of proof that would govern the Plaintiffs' claims.  The SMDI Defendants referred the Court to the Tenth Circuit's *Amdura*[129] decision for the proposition that the Plaintiffs must prove the Domain Name was property of the estate at the time of the relevant pre and post-petition transfers by "clear and convincing" evidence.  The Plaintiffs argued that on the issue of standard of proof, *Amdura* is distinguishable and limited to the narrow factual circumstances of that case.  They further urged the Court to apply the preponderance of the evidence standard articulated in the Supreme Court's decision of *Grogan v. Garner*.[130]

In *Amdura*, a debtor-subsidiary sought turnover of funds in debtor-parent corporation's bank account (known as a concentration account) and an injunction against the parent's use of the funds to pay its creditors.[131]  Under the parent's existing cash management system, all of its subsidiaries' individual receipts from each of their individual lockbox accounts were swept daily into the parent's concentration account.[132]  This arrangement gave the parent complete control over the concentration account funds, which it used to pay its subsidiaries' as well as its own obligations.[133]  The bankruptcy court declined to issue an injunction, and both parties filed cross-motions for summary judgment.  After the bankruptcy court granted the parent's motion, the debtor-subsidiary appealed. The district court affirmed, and the subsidiary appealed again.  The

---

[129]     *In re Amdura Nat'l Distrib. Co. v. Amdura Corp., Inc. (In re Amdura Corp.)*, 75 F.3d 1447 (10th Cir. 1996).

[130]     498 U.S. 279 (1991).

[131]     *Amdura Corp.*, 75 F.3d at 1450.

[132]     *Id.* at 1449.

[133]     *Id.*

Tenth Circuit noted that the subsidiary was required to "prove with clear and convincing evidence" that the funds in the concentration account were property of the subsidiary's bankruptcy estate.[134]  It then concluded that because the concentration account was exclusively in the parent's name and the parent "possessed all other legally cognizable indicia of ownership," the subsidiary did not have an ownership interest in any of the funds in the concentration account.[135]

In applying the clear and convincing standard, the *Amdura* court did not discuss what circumstances, if any, warranted a deviation from the preponderance of the evidence standard articulated in *Grogan*.  In fact, the *Amdura* court made no mention of *Grogan* even though it was issued five years before *Amdura.*  In *Grogan*, the Supreme Court specifically held that a preponderance of the evidence standard is presumptively applied in bankruptcy proceedings like other civil matters "unless particularly important individual interests or rights are at stake."[136]  Observing that a debtor has no fundamental right to a discharge in bankruptcy, the Supreme Court

---

[134]    *Id*. at 1451.  This statement likely stems from the 1948 Supreme Court decision of *Maggio v. Zeitz (In re Luma Camera Serv., Inc.)*, 333 U.S. 56 (1948), an 1898 Bankruptcy Act case.  "Prior to the enactment of the Bankruptcy Code in 1978, turnover was a creature of 'judicial innovation,' and not expressly provided for by statute." *U.S. v. Krause (In re Krause)*, No. 05-17429, 2009 Bankr. LEXIS 317, at *33 (D. Kan. Jan. 30, 2009).  As the *Maggio* court explained, "In applying these grants of power, courts of bankruptcy . . . fashioned the summary turnover procedures as one necessary to accomplish their function of administration.  It enables the court summarily to retrieve concealed and diverted assets . . . the withholding of which, pending the outcome of plenary suits, would intolerably obstruct and delay administration. When supported by 'clear and convincing evidence,' the turnover order has been sustained as an appropriate and necessary step in enforcing the Bankruptcy Act." *Maggio*, 333 U.S. at 62-63. The Bankruptcy Act has since been repealed and many of the concerns expressed in *Maggio* were resolved by the Bankruptcy Code.

[135]    *Amdura Corp.*, 75 F.3d at 1451.

[136]    *Grogan*, 498 U.S. at 286.

41

concluded that a heightened standard of proof was not required in debt non-dischargeability

cases, including non-dischargeability based on fraud.[137]  As Judge Nugent points out in *Krause*,

"the clear and convincing standard is even less compelling in a bankruptcy turnover proceeding,

given a debtor's statutory duty to cooperate with the trustee and surrender to the trustee property

of the estate."[138]  The Court agrees with the reasoning in *Krause* and *Grogan* that unless some

important personal interest is at stake that warrants the application of a heightened standard of

proof, a lesser standard should apply in turnover proceedings.  *Amdura*, however, makes other

determinations that are on point and which the Court refers to hereafter.

It is unclear from the facts of *Amdura* whether any "particularly important individual

interests or rights" were at stake in that case that may have prompted the application of the clear

and convincing standard.  To the extent that there were any, this Court does not believe that those

circumstances exist in this case.  Accordingly, the Court is compelled to apply the preponderance

of the evidence standard articulated in *Grogan*.  Having determined the applicable standard of

proof, the Court will now address whether the Plaintiffs have satisfied their burden in proving that

the Domain Name is property of the Paige bankruptcy estate.

Section 541, which delineates the scope of what constitutes "property of the estate,"

provides that property of the estate includes "(a) all legal or equitable interests of the debtor in

property as of the commencement of the [bankruptcy] case" wherever located and by whomever

held.[139]  "[T]he scope of [§] 541 is broad and should be generously construed [;] . . . an interest

---

[137]     *Krause*, 2009 Bankr. LEXIS 317, at *35 (citing *Grogan*, 498 U.S. at 286).

[138]     *Id.*

[139]     *Parks v. FIA Card Servs., N.A. (In re Marshall)*, 550 F.3d 1251, 1255 (10th Cir.
2008) (citing to 11 U.S.C. § 541(a)).

may be property of the estate even if it is novel or contingent."[140]  The Tenth Circuit has

interpreted this section to mean that property that is titled in the name of the debtor and that is

under the debtor's "dominion or control" is presumptively property of the estate.[141]  The debtor

has dominion or control if he has "the ability to direct the disposition of [the transferred

property]."[142]

Based on the evidence presented at trial, the Court determines that Paige exercised

dominion and/or control over the Domain Name at relevant times both pre- and post-petition up

until it was taken by Sayers and given to Timothy.  It is undisputed that the Domain Name was

registered in Paige's personal name from May 3, 2000 until June 14, 2005.[143]  During this time

period, Paige was personally invoiced for the initial registration fee and the renewal fee, which he

paid with his personal credit card.  Although the SMDI Defendants argued that CCS reimbursed

him for these charges, Becky Brady, the bookkeeper for CCS, testified that CCS paid Paige's

entire personal credit card bill and not just the registration fee charges.  Paige was also personally

invoiced for web hosting services for the Domain Name.

---

[140]     *Id*. (quoting *Baer v. Jones (In re Montgomery)*, 224 F.3d 1193, 1194 (10th Cir. 2000)).

[141]     *See Amdura Corp.*, 75 F.3d at 1451 (holding that in the Tenth Circuit there is a presumption that "deposits in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is established"); *see also Marshall*, 550 F.3d at 1255 (adopting the "dominion/control" test and holding that "a transfer of property will be a transfer of 'an interest of the debtor in property' if the debtor exercised dominion or control over the transferred property").

[142]     *Marshall*, 550 F.3d at 1256-57.

[143]     Pretrial Order, Ex. B.  This stipulated exhibit reflects the Domain Name registration history and changes to the registration in the Network Solutions records.

43

Even after Paige entered into the joint venture agreement with Colt in January 2005, the registration remained in Paige's personal name. The Domain Name was not transferred to Conklin until June 14, 2005. Although it remained in Conklin's name until November 24, 2005, Conklin testified that he never had an ownership interest in the Domain Name. He acknowledged that after the Colt Separation Agreement, he held the Domain Name at Paige's behest and would have transferred it to whomever Paige directed. The Court finds Conklin credible and his testimony persuasive.

The Colt Separation Agreement effectively unwound the joint venture between Paige and Colt and cancelled the Colt APA. Although that agreement states that the Domain Name was to be transferred "back to CCS," all the principal parties to the agreement testified that they understood that the Domain Name belonged to Paige and was to be returned to him personally. Specifically, Haleua, who drafted the Colt Separation Agreement and was the lead negotiator of the Colt APA, testified that pursuant to the Colt Separation Agreement the Domain Name was to go back to Paige because Haleua received it from Paige and his investigation of the Domain Name revealed that it belonged to Paige. The Court finds Haleua credible and his testimony on this issue reliable. Similarly, when asked about the effect of the Colt Separation Agreement at the September 2006 meeting with May and his attorney, Paige explained that the Domain Name was to be returned to him because he had purchased the Domain Name for himself and not CCS. The Court finds this explanation credible.

The SMDI Defendants, however, would like the Court to disregard these statements and confine its analysis to a single phrase – "back to CCS"– in the Colt Separation Agreement. The

Colt Separation Agreement, however, is ambiguous on its face.[144]  It is unclear whether the phrase "back to CCS" meant back to Paige, back to CCS, LLC, back to CCS Financial, back to Colt Credit Services, LLC, or back to someone else.  The term "CCS," although defined in the Colt APA as CCS Financial, is not defined in the Colt Separation Agreement.  Moreover, neither CCS, LLC, which was party to the Colt APA, nor CCS Financial are parties to the Separation Agreement.  The Colt Separation Agreement is between "Steve Paige, Allene Paige, Lee Price and Tali Haleua" as "members of CCS Financial and/or Colt Credit Services, LLC," and is executed by each of them in their individual capacity and not as representatives of CCS Financial or Colt Credit Services, LLC.

Given these and other inconsistencies in the Colt Separation Agreement, the Court determines that it is appropriate to consider extrinsic evidence, in the form of witness testimony, to interpret the meaning and intent of the phrase "back to CCS."[145]  Based on Haleua's, Paige's, and Conklin's statements, as well as the testimony of the other parties to the Colt Separation Agreement, the Court determines that the phrase "back to CCS" meant back to Paige personally.  Therefore, as of July 18, 2005 when the Colt Separation Agreement was signed and through the Petition Date, Paige was the beneficial and legal owner of the Domain Name.

---

[144]      A contract is ambiguous when "'the words used to express the meaning and intention of the parties are insufficient in a sense that the contract may be understood to reach two or more possible meanings.'" *Sparrow v. Tayco Constr. Co.*, 846 P.2d 1323, 1327 (Utah Ct. App. 1993).

[145]      *See*, e.g., *Mathis v. Madsen*, 261 P.2d 952, 956 (Utah 1953) (holding that where the meaning of an agreement is "ambiguous or uncertain, the Court may consider other contemporaneous writings concerning the same subject matter, and may, if it is still uncertain, consider parol evidence of the parties' intention"); *Plateau Min. Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990) ("If a contract is ambiguous, parol evidence is admissible to explain the parties' intent.  Whether a contract is ambiguous is a question of law which must be decided before parol evidence is admitted.").

The interactions between the parties subsequent to Paige's bankruptcy filing show that Paige continued to exercise control over the Domain Name after the Petition Date and was treated as its owner by others.  Subsequent to his bankruptcy filing, May contacted Paige seeking to purchase the Domain Name from him.  May and Paige exchanged numerous emails and phone calls discussing the terms of the purchase.  The specifics of those communications are summarized in the Court's Findings.  In all of these communications, the parties consistently referred to the Domain Name as Paige's personal asset, using terms such as "my domain name" (in the statements by Paige to May and his counsel) and "your domain name" (in statements by May to Paige).  In fact, between October and December 2005, May made at least three written offers to purchase the Domain Name from Paige personally, even though he was aware that Paige was not the registrant in the Network Solutions records.

Even after May learned that CCS and PSNet had combined or somehow merged, and was instructed by Paige to go through Sayers/PSNet, May continued to direct his offers for the purchase of the Domain Name to Paige personally.  When May discovered in November 2005 that the Domain Name was registered to Conklin, he withdrew his offer.  However, after speaking to Conklin and reviewing the Colt Separation Agreement, May resumed his negotiations with Paige despite the language in the Colt Separation Agreement stating that the Domain Name was to be returned "back to CCS."

The foregoing shows that regardless of who was listed as the registrant of the Domain Name or what the Colt Separation Agreement stated, like Conklin and Haleua, May understood that Paige retained control over the Domain Name.  The Court specifically finds that control and

dominion of the Domain Name were exercised by Paige as of Petition Date and for some time
thereafter.

Additionally, in his dealings with third parties, including clients and purchasers, Paige
represented the Domain Name as his personal asset, not an asset of CCS. For example, after he
received the first offer from May, he wrote in an email to a friend that he was going to receive
$140,000 from the sale of his "$8 domain name" and that, in addition, he was going to get
business leads for CCS. This email demonstrates that Paige distinguished himself from CCS, and
expected to keep the proceeds from the Domain Name's sale for his personal benefit. On another
occasion, in response to pointed questions from the SMDI Defendants' counsel, Paige explained
in detail why he believed that the Domain Name belonged to him personally and not to CCS.
Contrary to the SMDI Defendants' assertions, the Court does not believe that Paige had anything
to gain from May or SMDI when he made these statements. Paige made similar representations
to his own counsel (Eliason) when he sought Eliason's advice on how to get the Domain Name
back from Sayers. Finally, the assertions that he personally owned the Domain Name are further
supported by the statements he made at his meeting of creditors when he testified that, even
though he did not include the Domain Name in his bankruptcy schedules, he maintained an
interest in the Domain Name at the time he filed for bankruptcy. The Court finds the statements
made at the meeting of creditors particularly persuasive because Paige knew that he could face
criminal charges for failing to disclose the Domain Name in his bankruptcy papers, which he
signed under penalty of perjury.

The SMDI Defendants have asked the Court to disregard the foregoing statements and
instead to focus on some of Paige's trial testimony and the statements made at the Rule 2004
examination. The SMDI Defendants argued that at the Rule 2004 examination, Paige testified

nine times that the Domain Name belonged to CCS.  Although the testimony at the Rule 2004

examination was given prior to the filing of this Adversary Proceeding and the Denial of

Discharge Action, Paige had already been advised by his counsel that the Domain Name was part

of his bankruptcy estate.  The Court, therefore, believes that Paige had a strong motive to

obfuscate the individual character of the Domain Name so as to avoid potential denial of

discharge or criminal liability.    Accordingly, the Court questions the veracity and reliability of

Paige's statements made at the Rule 2004 examination, and gives little weight to them.

Even if the Court were to believe those statements, the Court is not persuaded that CCS

ever owned or exercised control over the Domain Name.  First, CCS, LLC was not formed until

August 2002, several years after the Domain Name's initial registration.  To the extent that CCS

Financial was in existence at that time, it never appeared in the Network Solutions records as the

registrant or as the administrative or technical contact.  In fact, neither CCS Financial nor CCS,

LLC were ever listed in any of the relevant registration fields in the WHOIS database.  Second,

Paige could not identify any documents showing that the Domain Name was ever transferred to

either CCS Financial or CCS, LLC, and no such documents were admitted at trial.  Third, neither

CCS, LLC nor CCS Financial ever filed any pleadings or intervened in this Adversary

Proceeding, nor have they asserted any claims or interest to the Domain Name.  Similarly, neither

entity has filed a proof of claim in the Main Bankruptcy Case, further diluting the SMDI

Defendants' argument that CCS owned the Domain Name.  Fourth, Conklin and Haleua, both of

whom the Court has found to be credible, testified that upon the execution of the Colt Separation

Agreement, the Domain Name was to go back to Paige personally and not to CCS.  Fifth, none of

the emails between May and Paige between October and December 2005 make any mention of

CCS or any other company in connection with the Domain Name.  In fact, May specifically

48

directed each of his purchase offers to Paige individually, not to CCS.  Sixth, as demonstrated in

the preceding section, control at all times rested with Paige.  Finally, even though CCS may have

used the Domain Name as part of its business operation or in its marketing materials to generate

clients, this is insufficient to show that CCS owned the Domain Name.

Although, at first blush, the evidence may appear confusing as to who owned the Domain

Name, the Court is persuaded that Paige personally owned and controlled it prior to, as of, and

through the Petition Date.  The Court, therefore, finds that the Plaintiffs have carried their burden

to show that the Domain Name was property of the estate on the Petition Date.

C.      The Pre-Petition Transfer of the Domain Name to Conklin

In counts one through four of the Amended Complaint, the Plaintiffs, among other things,

sought to avoid the pre-petition transfer of the Domain Name to Conklin who was an agent of

Colt.  For the following reasons, the Court believes that it is unnecessary to address the Plaintiffs'

pre-petition avoidable transfer claims.  First, Conklin and Colt denied having any ownership

interest in the Domain Name after the Colt Separation Agreement.  Second, under the Colt

Separation Agreement, the terms of which are discussed in the preceding section, Colt

relinquished its interest in the Domain Name on July 18, 2005, and the Domain Name reverted

back to Paige.  Accordingly, counts one through four of the Amended Complaint are inapplicable

because the Domain Name reverted back to Paige three months before the Petition Date.  Counts

one through four should therefore be dismissed.

Since the last day of trial, the Court has been apprised that Conklin filed for chapter 7

bankruptcy protection with this Court on July 30, 2009 (Case No. 07-27953).  Thus, even if

counts one through four were applicable, the Court would not enter a judgment against him unless

and until the automatic stay in his case was modified.

49

D.    The Post-Petition Transfers of the Domain Name Constituted a Violation of the
Automatic Stay

In count five of the Amended Complaint, Plaintiffs argued that because the Domain Name

belonged to Paige and became property of the estate on the Petition Date, the post-petition

transfer of the Domain Name to PSNet/Sayers and all subsequent transfers violated the automatic

stay.  They argued that if the Court determines that § 362 applies in this case, this would

effectively end the analysis because any transfers in violation of the automatic stay are void ab

initio.

The SMDI Defendants, on the other hand, argued that the Plaintiffs are not entitled to

relief under § 362 because a debtor-initiated, unauthorized, post-petition transfer of estate

property is not void but avoidable under § 549.  According to the SMDI Defendants, such

transfers are valid and legally effective when made even though the Trustee can avoid them under

§ 549 and recover the property from the initial and/or subsequent transferees under § 550.  They

argued that the Trustee cannot recover the Domain Name from the SMDI Defendants because

they qualify for the good faith purchaser's defense under § 550.

Before the Court can decide whether the Plaintiffs prevail on their fifth cause of action, it

must first determine whether § 362 or § 549 governs the post-petition transfers in this case.

Although the Tenth Circuit has not addressed the interplay between § 362 and § 549, courts in

other jurisdictions that have considered the issue have concluded that the two sections are

mutually exclusive and serve distinct purposes.[146]  Section 362(a) is designed to protect the

---

[146]    See U.S. v. Miller, No. Civ.A.5:02-CV-0168-C, 2003 WL 23109906, at *12-13
(N.D. Tex. Dec. 22, 2003) (concluding that "§§ 362 and 549 are held to apply to mutually
exclusive circumstances"); see also 40235 Wash. St. Corp. v. W.C. Lusardi, 329 F.3d 1076,
1081-82 (9th Cir. 2003) (holding that because "sections 362 and 549 are designed to protect
different parties, it is not surprising that an exception to one would not apply to the other.");

debtor's assets while the bankruptcy proceedings are underway by prohibiting all involuntary transfers of those assets without first obtaining a lift of stay.[147]  In contrast, § 549 provides a remedy to creditors when the debtor himself initiates an unauthorized post-petition transfer of estate property.[148]  In those situations, the trustee is authorized to avoid the transfer and recover the property from the transferees for the creditors' benefit.[149]

The relationship between § 362 and § 549 is particularly well-illustrated in *In re Garcia*,[150] which the Court finds helpful.  In *Garcia*, the court explained that § 362 is "targeted at the activities of creditors [and third parties]" and "does not specifically prohibit the debtor from willingly transferring an interest in property of the estate post-petition."[151]  It further observed that this leaves "an entire realm of post-petition transfers subject to § 549 . . . . These are post-petition transfers in which the debtor is a *willing participant*, but which, though not prohibited by the automatic stay, are not otherwise authorized by the Bankruptcy Court."[152]  Thus, whether § 362 or

---

*Schwartz v. U.S. (In re Schwartz)*, 954 F.2d 569, 574 (9th Cir. 1992) (noting that since "section 362's automatic stay does not apply to sales or transfer of property initiated by the debtor, . . . section 549 has a purpose in bankruptcy beyond the potential overlap with section 362.").

[147]    *Lusardi*, 329 F.3d at 1081 (citing *In re Schwartz*, 954 F. 2d at 571) ("[The stay] is designed to protect debtors from all collection efforts while they attempt to regain their financial footing")); *Miller*, 2003 WL 23109906, at * 13 (citing to *Garcia v. Phoenix Bond & Indem. Co. (In re Garcia)*, 109 B.R. 109 B.R. 335, 338-39 (N.D. Ill. 1989)).

[148]    *Id*.; *In re Tippett*, 338 B.R. 82, 85-89 (B.A.P. 9th Cir. 2006) (holding that an unauthorized post-petition transfer that was initiated by the debtor did not violate the automatic stay but, instead, was avoidable under § 549).

[149]    *Lusardi*, 329 F.3d at 1081.

[150]    109 B.R. 335 (N.D. Ill. 1989).

[151]    *Id*. at 339.

[152]    *Id*.

§ 549 controls depends on the debtor's role in the transaction at issue. If the Court finds that the

Debtor initiated or willingly participated in the post-petition transfer to PSNet/Sayers, then the

Plaintiffs' exclusive remedy would be under § 549.

The Court does not believe that the Debtor initiated or authorized the post-petition transfer

of the Domain Name to PSNet/Sayers. In looking closely at the PSNet APA, which served as the

basis for the Domain Name's transfer to PSNet/Sayers, the Court notes that the agreement is

between PSNet as "Buyer" and CCS Financial and CCS, LLC as "Sellers."[153]  Paige is not listed

as a "Seller."  Pursuant to the agreement, PSNet purchased all of the assets and property of the

"Seller," including "all intellectual property . . . and any additional credit related assets and/or

software . . . owned by the Seller, *Steve Paige* . . . including the internet domain name

'freecreditscore.com.'"[154] Although the agreement lists the Domain Name as one of the assets

being sold to PSNet, Paige did not *personally* sign the PSNet APA.  Rather, he signed it in his

capacity as "Managing Member" of "CCS Financial, LLC/Consumer Credit Services, LLC."

Accordingly, since the Debtor was not *individually* a party to the agreement, and where

the Court has found that Paige was the owner on the Petition Date, any attempted transfer of the

Domain Name to PSNet pursuant to the PSNet APA was without the Debtor's authorization.  This

may have been sloppy paperwork by the parties, but considering how Paige referred to and treated

his ownership in the Domain Name, it is not surprising.  Nevertheless, this persuades the Court

that there was no voluntary transfer from Paige because he never signed the agreement

personally.  The Court will not delve into revising this agreement.  All this agreement does is

---

[153]      Ex. 44.

[154]      *Id*. (emphasis added).

refer to an asset owned by Paige.  Without him conveying it, the agreement did not and could not

transfer any title in the Domain Name.

The Court further finds that the PSNet APA is ambiguous on its face.  As such, it is

appropriate to consider extrinsic evidence to determine its true meaning and effect.  Paige's trial

testimony and statements at the September 2006 meeting show that the Debtor did not initiate the

Domain Name's transfer to PSNet.  Specifically, when he was asked abut the PSNet-CCS

transaction, Paige testified that the Domain Name was not supposed to be part of that transaction.

He explained that the PSNet-CCS transaction, memorialized in the PSNet APA, only involved the

purchase of CCS assets, not his personal assets.  Paige further testified that at no point did he

authorize Sayers to put the Domain Name in Sayers'  name.  He clarified that when he asked

Sayers to facilitate the Domain Name's transfer from Conklin back to him (Paige), he did NOT

agree to Sayers' putting it in his own name.  These statements appear to be consistent with

Paige's  responses at the September 2006 meeting held in the SMDI Defendants' counsel's office

where Paige stated that when PSNet/Sayers had expressed an interest in purchasing CCS, Paige

made it clear that the Domain Name would not be part of the transaction.  Notwithstanding the

Court's aversion to giving credibility to Paige's other statements, the Court finds Paige's

testimony and statements on this issue credible and persuasive.

Based on the foregoing, the Court concludes that since the Debtor neither authorized nor

willingly transferred the Domain Name to PSNet, § 549 does not apply to this proceeding.[155]

---

[155]      Having determined that § 549 does not apply, the Court concludes that the
Plaintiffs' fifth cause of action should be dismissed.

Accordingly, the post-petition transfer of the Domain Name to PSNet/Sayers, as well as all

subsequent transfers, must be analyzed under § 362 only.

As previously stated, section 362(a)(3) expressly prohibits any act to obtain possession of

or to exercise control over property of the estate absent court approval.  The Court has already

determined that the Domain Name was property of the estate on the Petition Date.  Hence,

Conklin's transfer of the Domain Name in response to Sayers' request was an act by

Sayers/PSNet to obtain possession of or to otherwise interfere with the estate's interest in the

Domain Name.  Similarly, all transfers of the Domain Name or changes to its registration

subsequent to Conklin's transfer to PSNet (i.e. PSNet to Timothy/Promarketing and then

Timothy/Promarketing to May/SMDI) also constituted actions to obtain possession or exercise

control over property of the estate.  No Court approval was either sought or obtained for any of

these post-petition transfers.  Consequently, all post-petition transfers of the Domain Name and/or

changes to its registration were in violation of the automatic stay.

In the Tenth Circuit, actions taken in violation of the automatic stay are void ab initio, and

knowledge of the stay on the part of the offending party is irrelevant.[156]  As such, they are without

legal effect.[157]  From the law's point of view, they simply did not happen.  Based on the

foregoing, the Court concludes that all post-petition transfers of the estate's rights in the Domain

Name were void.  Accordingly, a judgement for the Plaintiffs should be entered on count five

---

[156]    *Franklin Sav. & Loan Ass'n v. Office of Thrift Supervision*, 31 F.3d 1020, 1022
(10th Cir. 1994); *Ellis v. Consol. Diesel Elec. Corp.*, 894 F.2d 371, 372-73 (10th Cir. 1990).

[157]    *Id.*

E.     The Plaintiffs' State Law Conversion Claim

As an alternative basis for the foregoing conclusion, the Court will address the Plaintiffs'

conversion claims.  In their seventh count of the Amended Complaint, the Plaintiffs argued that

each of the post-petition transfers constitute acts of conversion under Utah law.  The SMDI

Defendants have argued, however, that the Plaintiffs' state law conversion claim is preempted by

the Bankruptcy Code.  The Court disagrees.  The Bankruptcy Code "was written with the

expectation that it would be applied in the context of state law and that federal courts are not

licensed to disregard interests created by state law when that course is not clearly required to

effectuate federal interests."[158]  Nothing in the Bankruptcy Code or elsewhere suggests that

Utah's conversion laws are in conflict with the Bankruptcy Code or other federal laws.

Accordingly, there is a proper bases for the Court to consider the Plaintiffs' conversion claim.

Under Utah law, conversion is an "act of willful interference with [property] done without

lawful justification by which the person entitled thereto is deprived of its use and possession.[159]

Although conversion results from intentional conduct it does not require a conscious wrongdoing,

but only an intent to exercise dominion or control over the goods inconsistent with the owner's

rights.[160]  The Plaintiffs must prove all elements of conversion by a preponderance of the

evidence.[161]

---

[158]     *In re Mushroom Trans. Co., Inc.*, 227 B.R. 244, 253 (Bankr. E.D. Pa. 1998)
(citing *Integrated Solutions, Inc. v. Servo Support Specialties, Inc.*, 124 F.3d 487, 492 (3d Cir.
1997)).

[159]     *Healthcare Servs. Group, Inc. v. Utah Dep't of Health*, 40 P.3d 591, 598 (Utah
2005); *Allred v. Hinckley*, 328 P.2d 726, 728 (Utah 1958).

[160]     *Allred*, 328 P.2d at 728.

[161]     *ANR Ltd. Inc. v. Chattin*, 89 B.R. 898, 905 (D. Utah 1988).

Before the Court delves into the specific elements of the Plaintiffs' conversion claim, it must decide whether the Domain Name is "property" capable of conversion. While acknowledging that there are no published opinions applying Utah law to conversion of domain names, the Plaintiffs argued that Utah law has recognized that intangible property in the form of stock ownership can be converted.[162] They argued that like stock, a domain name is a form of intangible property. For reasons articulated hereafter, the Court disagrees with the Plaintiffs and concludes that Utah law does not recognize a claim for conversion of intangible property.

The Plaintiffs also referred the Court to a case from the Ninth Circuit Court of Appeals, where domain names were found to be personal property subject to a conversion action.[163] In *Kremen v. Cohen*,[164] which the Plaintiffs contended is one of the leading cases on the issue, the Ninth Circuit was asked to decide whether Network Solutions could be held liable for conversion for assigning a domain name to a third party on the basis of a forged letter. The main issue in *Kremen* was whether a domain name was intangible personal property that could be converted. In ruling that it was, the *Kremen* court noted that "[l]ike a share of corporate stock or a plot of land, a domain name is a well-defined interest. Someone who registers a domain name decides where on the Internet those who invoke that particular name . . . are sent. Ownership is exclusive in that

---

[162]    *Ockey v. Lehmer*, 189 P.3d 51 (Utah 2008) (recognizing availability of a conversion action where the property converted involved stocks); *Macris v. Sculptured Software, Inc.*, 24 P.3d 984 (Utah 2001) (same); *Broadwater v. Old Republic Sur.*, 854 P.2d 527 (Utah 1993) (same).

[163]    337 F.3d 1024 (9th Cir. 2003).

[164]    337 F.3d 1024 (9th Cir. 2003).

the registrant alone makes that decision.  Moreover, like other forms of property, domain names

are valued, bought and sold, often for millions of dollars[.]"[165]

The SMDI Defendants rejected the Plaintiffs' characterization of the Domain Name as

intangible personal property, arguing that a property interest in a domain name is not an interest

in the domain name itself.  Rather, it is a registrant's interest in the service contract with a

registrar that permits the registrant to use the domain name for a specified period of time.  In

making this argument, they relied primarily on the language in various Network Solutions service

contracts.  In essence, the SMDI Defendants argued that "ownership" rights in a domain name are

mere contractual rights, which are circumscribed by the terms of the applicable service agreement

with the registrar.

The SMDI Defendants' argument, however, fails for the following reasons.  First, they did

not raise this argument in their opening trial brief (although they addressed it in their reply

brief).[166]  Under the terms of the Pretrial Order, any legal issues or theories not raised in the

parties' trial briefs (referring to opening briefs) are waived.[167]  As such, the SMDI Defendants'

argument on this issue is precluded.  Second, even if the Court were to consider their argument, it

is premised on a case that applies Virginia law.[168]  Since property rights are created by state law,

---

[165]    *Id.* at 1030.

[166]    The Defendants also raised this argument at the conclusion of the Plaintiffs' case-in-chief in their oral Motion for Judgment on Partial Findings under Rule 52(c) of the Federal Rules of Civil Procedure (the "Rule 52 Motion").  The Court postponed its ruling on this issue until the close of trial.

[167]    Adversary Proceeding (Docket No. 254).

[168]    In arguing that domain name rights are mere contract rights and not property rights, the SMDI Defendants relied on a case from the Virginia Supreme Court, *Network Solutions, Inc. v. Umbro Int'l, Inc.*, 529 S.E..2d 80 (Va. 2000).  The Defendants argued that

the Court believes that it must apply Utah law in this instance.[169]  For similar reasons, the Court

also rejects the Plaintiffs' reliance on *Kremen* because in that case the Ninth Circuit applied

California law in concluding that domain names are intangible personal property.  The Court

further declines to follow *Kremen* because Utah does not appear to have followed the same path

as California on this issue.[170]

The Court, instead, is persuaded by the reasoning in *Margae, Inc. v. Clear Link*

*Technologies, LLC,*[171] a recent decision from this District.  In *Margae*, an entrepreneur filed an

action against a competitor alleging, among other things, conversion of its web pages and other

intellectual property.  The issue before the court was whether Utah law recognized a claim for

conversion of intangible intellectual property.  While noting that this was a case of first

impression, the court explained that Utah would not allow a conversion claim for intangible

property because it follows the Restatement (Second) of Torts for guidance.[172]  It reasoned that

the "Restatement generally limits conversion actions involving intangible property to intangible

---

Virginia law was controlling under the choice of law provisions of the Network Solutions service agreements.  This would be the case if the Court were to find that domain name rights are contract rights and, therefore, governed by the Network Solutions service agreement, which the Court does not.

[169]    *See Butner v. U.S.*, 440 U.S. 48, 55 (1979) (holding that "bankruptcy courts must defer to [state law] when ascertaining interests in property").

[170]    *Margae, Inc. v. Clear Link Tech., LLC*, 620 F. Supp. 2d 1284, 1287 (D. Utah 2009).

[171]    620 F. Supp. 2d 1284 (D. Utah 2009).  The Court recognizes that the parties may not have discovered this decision since it was issued only days before closing arguments.

[172]    *Id.* at 1287.

property that is 'customarily merged in a document.'"[173] The court rejected the defendant's

argument, however, that web pages are intangible property subject to the merger requirement.

Instead, the court ruled that "Utah would consider web pages as a type of tangible property."[174]

The court then cited to a case from the Utah Supreme Court which held that "software is

'tangible personal property' for tax purposes, even after it has been installed on the computer."[175]

In so holding, the Utah Supreme Court explained that "[s]oftware is information recorded in a

physical form which has a physical existence, takes up space on the tape, disc, or hard drive,

makes physical things happen, and can be perceived by the senses.  The purchaser of computer

software neither desires nor receives mere knowledge but an arrangement of matter that will

direct a computer to perform a particular function."[176]  Relying on the Utah Supreme Court's

characterization of software, the *Margae* court concluded that "like 'software' . . . a web page has

a physical presence on [sic] computer drive, causes tangible effects on computers, and can be

perceived by the senses."[177] The court further noted that web pages are tangible personal property

because "they can be physically altered by authorized users and access to web pages can be

physically restricted by the use of passwords and other security measures."[178]

---

[173]     *Id*. (citing RESTATEMENT (SECOND) OF TORTS § 242(2)).

[174]     *Id*.

[175]     *Id*. (citing *South Cent. Utah Tel. Assoc., Inc. v. Auditing Div. of the Utah State Tax Comm'n*, 951 P.2d 218, 223-24 (Utah 1997)).

[176]     *Id*. at 1288 (quoting *South Cent. Utah Tel. Assoc., Inc.*, 951 P.2d at 223-24).

[177]     *Margae*, 620 F. Supp. 2d at 1288.

[178]     *Id*.

Based on the reasoning in *Margae*, which the Court elects to follow, the Court determines that like web pages and software, domain names can be perceived by the senses and access to them can be physically restricted by the use of passwords and other security measures.  In fact, the reason that the Plaintiffs cannot access the Domain Name at this point is because May/SMDI has "locked out" or physically restricted their access by changing the username and password. Moreover, unlike a mere idea that can only be stored in a person's mind, domain names can and do have a physical presence on a computer drive.  Accordingly, the Court concludes that like web pages and software, the Domain Name at issue is a type of tangible property that is capable of conversion.

When applying the conversion elements to the facts of this case, the Court determines that Sayers willfully interfered with the Debtor's (and consequently the Trustee's) right to use and possess the Domain Name by transferring the Domain Name into Sayers' name without the Debtor's authorization, changing the username and password, and pledging it as collateral to Timothy.  Accordingly, the Court concludes that Sayers committed conversion and, therefore, did not have legal rights or title to the Domain Name.

Because Sayers obtained the Domain Name through conversion, he could not pass good title to Timothy[179] or anyone else.  Moreover, by taking the Domain Name from Sayers as collateral, Timothy, too, is liable for conversion.  In Utah, a person cannot escape liability for conversion by claiming that he purchased the property in good faith and for valuable

---

[179]    The Court notes that neither Timothy nor his company, Promarketing, filed answers in this proceeding.  As a result, default certificates were entered against them.  Timothy and Promarketing have also not appeared at any of the pretrial proceedings, attorney conferences and planning meetings, or at trial.  The Court, therefore, believes that it is appropriate to enter default judgments against Timothy and Promarketing as requested by the Plaintiffs.

consideration, even if he acquired the converted property innocently and without any

wrongdoing.[180]  Thus, even if the Court were to find that Timothy committed no wrongdoing

when he took the Domain Name, he, nonetheless, became a converter because he deprived the

Debtor (and consequently the Trustee) of his use and possession of the Domain Name.

Similarly, May committed conversion when he purchased the Domain Name from

Timothy.  Under the Utah Supreme Court's reasoning in *Allred v. Hinckley*, "[a] purchaser of

stolen goods . . . becomes a converter since his acts are an interference with the control of the

property. . . Thus a bona fide purchaser for value from one who has no right to sell them becomes

a converter when he takes possession of such goods."[181]  Accordingly, even if the Court were to

find that May was diligent in his efforts when purchasing the Domain Name, gave value, and took

the Domain Name in good faith, May would still have no rights in the Domain Name because he

took from one who had no right to sell it.  Consequently, under the reasoning of *Allred*, he, too,

became a converter.  Accordingly, as an alternative basis for determining that the Plaintiffs have

carried their burden, the Court concludes that under state law conversion, they should be awarded

judgment on their seventh count.

F.    Turnover of the Domain Name

In count eight of the Amended Complaint, the Plaintiffs seek turnover of the Domain

Name pursuant to § 542(a).  Section 542(a) of the Bankruptcy Code provides, in pertinent part,

that "an entity . . . in possession, custody, or control . . . of property that the trustee may use, sell

---

[180]    *See Allred*, 328 P.2d at 728 (holding that  "although conversion results only from
intentional conduct, it does not however require a conscious wrongdoing").

[181]    *Id.*

or lease . . . shall deliver to the trustee, and account for, such property . . . unless such property is of inconsequential value or benefit to the estate."[182]  The obligation to turn over property is immediate.[183]  Having already determined that the Domain Name is property of the estate, and there being no dispute that the Domain Name is if consequential value, the Court concludes that May/SMDI is required to turn over the Domain Name to the Trustee.  The Trustee is, in turn, required under the terms of the ConsumerInfo APA and the Sale Order to immediately convey the Domain Name to ConsumerInfo.  Furthermore, SMDI, as the current registrant of record of the Domain Name, is hereby ordered to immediately transfer the Domain Name to the Trustee or his designee using Network Solutions' procedures for transfer of ownership.

G.     Damages

The Plaintiffs argued that, in addition to recovering the Domain Name, they were also entitled to actual and punitive damages under § 362(k).  Section 362(k)(1) provides, in relevant part, that "an individual injured by any willful violation of a stay . . . shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."[184]  Although § 362(k) applies to "individuals," the Plaintiffs argued that the term has been expanded to include trustees, corporate debtors, and other entities.[185]  They argued

---

[182]      11 U.S.C. § 542(a).

[183]      *ALPA Corp. v. IRS (In re ALPA Corp.)*, 11 B.R. 281, 290 n.6 (Bankr. D. Utah 1981); *In re Berscheit*, 223 B.R. 579, 581 (Bankr. D. Utah 1998); *Knaus v. Concordia Lumber Co. (In re Knaus)*, 889 F.2d 773, 775 (8th Cir. 1998).

[184]      11 U.S.C. § 362(k)(1).

[185]      *See, e.g.*, *Utah State Credit Union v. Skinner (In re Skinner)*, 90 B.R. 470, 474 n.2 (D. Utah 1988), *aff'd* 917 F.2d 444 (10th Cir. 1990) (noting that "courts have construed the term 'individual' to encompass corporations and other legal entities injured by a violation of the automatic stay"); *Budget Serv. Co. v. Better Homes of Va., Inc.*, 804 F.2d 289, 292 (4th Cir.

that Jubber, in his representative capacity as trustee, has standing to pursue damages for the

Defendants' willful violation of the automatic stay.  Specifically, they claimed that the

Defendants should reimburse him for the legal fees, costs, and other obligations that he incurred

in recovering the Domain Name.

Even if the Court were inclined to find that the Plaintiffs are individuals within the

meaning of § 362(k), and were further inclined to find a "willful" violation of the stay by at least

some of the Defendants, there is insufficient evidence to support an award of actual and punitive

damages under § 362(k).  The Court also concludes that there is an insufficient bases for granting

punitive damages under the Plaintiffs' state-law conversion claim.

The Plaintiffs further alleged that they were entitled to the profits derived from

May's/SMDI's use of the Domain Name under § 550(a).  That section, however, does not apply

to void transfers under § 362.  Since the Court has already determined that § 362 governs the

post-petition transfers of the Domain Name in this proceeding, the Plaintiffs' claim for

disgorgement of profits under § 550(a) is unavailing.  Having failed to argue any additional legal

basis for recovery of May's/SMDI's profits besides § 550, the Plaintiffs are not entitled to the

said profits.  Accordingly, the Plaintiffs' sole remedy in this proceeding is the recovery of the

Domain Name.

---

1986) (finding that "individual" entitled to sanctions against those who willfully violated
automatic stay provisions included corporate debtor); *Phillips v. Lehman Bros. Holdings, Inc. (In
re Fas Mart Convenience Stores, Inc.*), 318 B.R. 370, 375 (Bankr. E.D. Va. 2004) (holding that
trustee had standing to pursue claim for damages for creditor's alleged willful violations of
automatic stay pursuant to § 362(h)).

**IV.     CONCLUSION**

Based upon the foregoing and the evidence presented at trial, the Court concludes as follows: (1) the Plaintiffs had post-confirmation standing to prosecute this Adversary Proceeding; (2) the Domain Name was property of the estate on the Petition Date, and at relevant times pre- and post-petition; (3) the post-petition transfers of the Domain Name were in violation of the automatic stay, and thus void ab initio; (4) alternatively, the Defendants committed conversion when they took the Domain Name without the Debtor's or the Trustee's consent and authorization; and (5) title is deemed to be in Trustee's or the estate's name, and the SMDI Defendants are ordered to turnover any rights they assert in the Domain Name, as well as any passwords and usernames, to the Trustee consistent with these findings and conclusions.  The Trustee is hereby ordered to prepare and submit a separate Judgment consistent with these findings and conclusions for the Court's approval and entry.

oo00–00oo
### SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below:

Gary E. Jubber
Douglas Payne
Fabian & Clendenin
215 South State St., 12th Floor
Salt Lake City, UT 84151
    *Attorneys for Gary Jubber, Liquidating Trustee*

Michael R. Johnson
Ray Quinney & Nebeker
36 South State St., Suite 1400
Salt Lake City, UT 84111
    *Co-Counsel for ConsumerInfo.com, Inc.*

Robert E. Richards
Sonnenschein Nath & Rosenthal
7800 Sears Tower
Chicago, IL 60606
    *Co-Counsel for ConsumerInfo.com, Inc.*

Michael N. Zundel
Adam S. Affleck
Andrew B. Clawson
Erin M. Stone
Prince Yeates & Geldzahler
175 East 400 South, Suite 900
Salt Lake City, UT 84111
    *Attorneys for Defendants Search Market Direct, Inc. and Stephen May*

David H. Sundwall
10421 South Jordan Gateway, Suite 500
South Jordan, UT 84095
    *Attorney for Chad Sayers and PSNet Communications*

PSNet and Chad Sayers
10150 Centennial Parkway, #400
Sandy, UT 84070

PSNet and Chad Sayers

65

10150 Centennial Parkway, #100
Sandy, UT 84070

Randy Conklin
2825 East Cottonwood Parkway, #400
Salt Lake City, UT 84121-7055

Promarketing Network, Inc.
c/o Mark Timothy
1466 Vintry Circle
Salt Lake City, UT 84121-1948

Mark Timothy
1466 Vintry Circle
Salt Lake City, UT 84121-1948